(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KENNEDY *v.* BREMERTON SCHOOL DISTRICT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–418. Argued April 25, 2022—Decided June 27, 2022

Petitioner Joseph Kennedy lost his job as a high school football coach in the Bremerton School District after he knelt at midfield after games to offer a quiet personal prayer. Mr. Kennedy sued in federal court, alleging that the District's actions violated the First Amendment's Free Speech and Free Exercise Clauses. He also moved for a preliminary injunction requiring the District to reinstate him. The District Court denied that motion, and the Ninth Circuit affirmed. After the parties engaged in discovery, they filed cross-motions for summary judgment. The District Court found that the "'sole reason'" for the District's decision to suspend Mr. Kennedy was its perceived "risk of constitutional liability" under the Establishment Clause for his "religious conduct" after three games in October 2015. 443 F. Supp. 3d 1223, 1231. The District Court granted summary judgment to the District and the Ninth Circuit affirmed. The Ninth Circuit denied a petition to rehear the case en banc over the dissents of 11 judges. 4 F. 4th 910, 911. Several dissenters argued that the panel applied a flawed understanding of the Establishment Clause reflected in *Lemon* v. *Kurtzman*, 403 U. S. 602, and that this Court has abandoned *Lemon*'s "ahistorical, atextual" approach to discerning Establishment Clause violations. 4 F. 4th, at 911, and n. 3.

*Held*: The Free Exercise and Free Speech Clauses of the First Amendment protect an individual engaging in a personal religious observance from government reprisal; the Constitution neither mandates nor permits the government to suppress such religious expression. Pp. 11–32.

   (a) Mr. Kennedy contends that the District's conduct violated both the Free Exercise and Free Speech Clauses of the First Amendment. Where the Free Exercise Clause protects religious exercises, the Free Speech Clause provides overlapping protection for expressive religious

activities.  See, *e.g.*, *Widmar* v. *Vincent*, 454 U. S. 263, 269, n. 6.  A plaintiff must demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses.  If the plaintiff carries his or her burden, the defendant must show that its actions were nonetheless justified and appropriately tailored.  Pp. 11–30.

(1) Mr. Kennedy discharged his burden under the Free Exercise Clause.  The Court's precedents permit a plaintiff to demonstrate a free exercise violation multiple ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable."  *Employment Div.*, *Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 879–881.  Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny, under which the government must demonstrate its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest.  See, *e.g., Church of Lukumi Babalu Aye*, *Inc.* v. *Hialeah*, 508 U. S. 520, 546.

Here, no one questions that Mr. Kennedy seeks to engage in a sincerely motivated religious exercise involving giving "thanks through prayer" briefly "on the playing field" at the conclusion of each game he coaches.  App. 168, 171.  The contested exercise here does not involve leading prayers with the team; the District disciplined Mr. Kennedy *only* for his decision to persist in praying quietly without his students after three games in October 2015.  In forbidding Mr. Kennedy's brief prayer, the District's challenged policies were neither neutral nor generally applicable.  By its own admission, the District sought to restrict Mr. Kennedy's actions at least in part because of their religious character.  Prohibiting a religious practice was thus the District's unquestioned "object."  The District explained that it could not allow an on-duty employee to engage in *religious* conduct even though it allowed other on-duty employees to engage in personal secular conduct.  The District's performance evaluation after the 2015 football season also advised against rehiring Mr. Kennedy on the ground that he failed to supervise student-athletes after games, but any sort of postgame supervisory requirement was not applied in an evenhanded way.  Pp. 12–14.  The District thus conceded that its policies were neither neutral nor generally applicable.

(2) Mr. Kennedy also discharged his burden under the Free Speech Clause.  The First Amendment's protections extend to "teachers and students," neither of whom "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506.  But teachers and coaches are also government employees paid in part to speak on the government's behalf and to convey its intended mes-

sages. To account for the complexity associated with the interplay between free speech rights and government employment, this Court's decisions in *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, and *Garcetti* v. *Ceballos*, 547 U. S. 410, and related cases suggest proceeding in two steps. The first step involves a threshold inquiry into the nature of the speech at issue. When an employee "speaks as a citizen addressing a matter of public concern," the Court's cases indicate that the First Amendment may be implicated and courts should proceed to a second step. *Id.*, at 423. At this step, courts should engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Ibid.* At the first step of the *Pickering–Garcetti* inquiry, the parties' disagreement centers on one question: Did Mr. Kennedy offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?

When Mr. Kennedy uttered the three prayers that resulted in his suspension, he was not engaged in speech "ordinarily within the scope" of his duties as a coach. *Lane* v. *Franks*, 573 U. S. 228, 240. He did not speak pursuant to government policy and was not seeking to convey a government-created message. He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach. Simply put: Mr. Kennedy's prayers did not "ow[e their] existence" to Mr. Kennedy's responsibilities as a public employee. *Garcetti*, 547 U. S., at 421. The timing and circumstances of Mr. Kennedy's prayers—during the postgame period when coaches were free to attend briefly to personal matters and students were engaged in other activities—confirms that Mr. Kennedy did not offer his prayers while acting within the scope of his duties as a coach. It is not dispositive that Coach Kennedy served as a role model and remained on duty after games. To hold otherwise is to posit an "excessively broad job descriptio[n]" by treating everything teachers and coaches say in the workplace as government speech subject to government control. *Garcetti*, 547 U. S., at 424. That Mr. Kennedy used available time to pray does not transform his speech into government speech. Acknowledging that Mr. Kennedy's prayers represented his own private speech means he has carried his threshold burden. Under the *Pickering–Garcetti* framework, a second step remains where the government may seek to prove that its interests as employer outweigh even an employee's private speech on a matter of public concern. See *Lane*, 573 U. S., at 242. Pp. 15–19.

(3) Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District. Under the Free Exercise Clause, a government entity normally

must satisfy at least "strict scrutiny," showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end. See *Lukumi*, 508 U. S., at 533. A similar standard generally obtains under the Free Speech Clause. See *Reed* v. *Town of Gilbert*, 576 U. S. 155, 171. The District asks the Court to apply to Mr. Kennedy's claims the more lenient second-step *Pickering–Garcetti* test, or alternatively, intermediate scrutiny. The Court concludes, however, that the District cannot sustain its burden under any standard. Pp. 19–30.

　　i. The District, like the Ninth Circuit below, insists Mr. Kennedy's rights to religious exercise and free speech must yield to the District's interest in avoiding an Establishment Clause violation under *Lemon* and its progeny. The *Lemon* approach called for an examination of a law's purposes, effects, and potential for entanglement with religion. *Lemon*, 403 U. S., at 612–613. In time, that approach also came to involve estimations about whether a "reasonable observer" would consider the government's challenged action an "endorsement" of religion. See, *e.g.*, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 593. But—given the apparent "shortcomings" associated with *Lemon's* "ambitiou[s]," abstract, and ahistorical approach to the Establishment Clause—this Court long ago abandoned *Lemon* and its endorsement test offshoot. *American Legion* v. *American Humanist Assn.*, 588 U. S. ___, ___ (plurality opinion).

In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by "'reference to historical practices and understandings.'" *Town of Greece* v. *Galloway*, 572 U. S. 565, 576. A natural reading of the First Amendment suggests that the Clauses have "complementary" purposes, not warring ones where one Clause is always sure to prevail over the others. *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 13, 15. An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some "'exception'" within the "Court's Establishment Clause jurisprudence." *Town of Greece*, at 575. The District and the Ninth Circuit erred by failing to heed this guidance. Pp. 19–30.

　　ii. The District next attempts to justify its suppression of Mr. Kennedy's religious activity by arguing that doing otherwise would coerce students to pray. The Ninth Circuit did not adopt this theory in proceedings below and evidence of coercion in this record is absent. The District suggests that *any* visible religious conduct by a teacher or coach should be deemed—without more and as a matter of law—impermissibly coercive on students. A rule that the only acceptable gov-

ernment role models for students are those who eschew any visible religious expression would undermine a long constitutional tradition in which learning how to tolerate diverse expressive activities has always been "part of learning how to live in a pluralistic society." *Lee* v. *Wesiman*, 505 U. S. 577, 590. No historically sound understanding of the Establishment Clause begins to "mak[e] it necessary for government to be hostile to religion" in this way. *Zorach* v. *Clauson,* 343 U. S. 306, 314. Pp. 24–30.

iii. There is no conflict between the constitutional commands of the First Amendment in this case. There is only the "mere shadow" of a conflict, a false choice premised on a misconstruction of the Establishment Clause. *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 308 (Goldberg, J., concurring). A government entity's concerns about phantom constitutional violations do not justify actual violations of an individual's First Amendment rights. Pp. 30–31.

(c) Respect for religious expressions is indispensable to life in a free and diverse Republic. Here, a government entity sought to punish an individual for engaging in a personal religious observance, based on a mistaken view that it has a duty to suppress religious observances even as it allows comparable secular speech. The Constitution neither mandates nor tolerates that kind of discrimination. Mr. Kennedy is entitled to summary judgment on his religious exercise and free speech claims. Pp. 31–32.

991 F. 3d 1004, reversed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and BARRETT, JJ., joined, and in which KAVANAUGH, J., joined, except as to Part III–B. THOMAS, J., and ALITO, J., filed concurring opinions. SOTOMAYOR, J., filed a dissenting opinion, in which BREYER and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

## No. 21–418

_____

## JOSEPH A. KENNEDY, PETITIONER *v.* BREMERTON SCHOOL DISTRICT

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### [June 27, 2022]

JUSTICE GORSUCH delivered the opinion of the Court.

Joseph Kennedy lost his job as a high school football coach because he knelt at midfield after games to offer a quiet prayer of thanks. Mr. Kennedy prayed during a period when school employees were free to speak with a friend, call for a reservation at a restaurant, check email, or attend to other personal matters. He offered his prayers quietly while his students were otherwise occupied. Still, the Bremerton School District disciplined him anyway. It did so because it thought anything less could lead a reasonable observer to conclude (mistakenly) that it endorsed Mr. Kennedy's religious beliefs. That reasoning was misguided. Both the Free Exercise and Free Speech Clauses of the First Amendment protect expressions like Mr. Kennedy's. Nor does a proper understanding of the Amendment's Establishment Clause require the government to single out private religious speech for special disfavor. The Constitution and the best of our traditions counsel mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike.

I

A

Joseph Kennedy began working as a football coach at Bremerton High School in 2008 after nearly two decades of service in the Marine Corps. App. 167. Like many other football players and coaches across the country, Mr. Kennedy made it a practice to give "thanks through prayer on the playing field" at the conclusion of each game. *Id.*, at 168, 171. In his prayers, Mr. Kennedy sought to express gratitude for "what the players had accomplished and for the opportunity to be part of their lives through the game of football." *Id.*, at 168. Mr. Kennedy offered his prayers after the players and coaches had shaken hands, by taking a knee at the 50-yard line and praying "quiet[ly]" for "approximately 30 seconds." *Id.*, at 168–169.

Initially, Mr. Kennedy prayed on his own. See *ibid.* But over time, some players asked whether they could pray alongside him. 991 F. 3d 1004, 1010 (CA9 2021); App. 169. Mr. Kennedy responded by saying, "'This is a free country. You can do what you want.'" *Ibid.* The number of players who joined Mr. Kennedy eventually grew to include most of the team, at least after some games. Sometimes team members invited opposing players to join. Other times Mr. Kennedy still prayed alone. See *ibid.* Eventually, Mr. Kennedy began incorporating short motivational speeches with his prayer when others were present. See *id.*, at 170. Separately, the team at times engaged in pregame or postgame prayers in the locker room. It seems this practice was a "school tradition" that predated Mr. Kennedy's tenure. *Ibid.* Mr. Kennedy explained that he "never told any student that it was important they participate in any religious activity." *Ibid.* In particular, he "never pressured or encouraged any student to join" his postgame midfield prayers. *Ibid.*

For over seven years, no one complained to the Bremerton School District (District) about these practices. See *id.*,

at 63–64. It seems the District's superintendent first learned of them only in September 2015, after an employee from another school commented positively on the school's practices to Bremerton's principal. See *id.*, at 109, 229. At that point, the District reacted quickly. On September 17, the superintendent sent Mr. Kennedy a letter. In it, the superintendent identified "two problematic practices" in which Mr. Kennedy had engaged. App. 40. First, Mr. Kennedy had provided "inspirational talk[s]" that included "overtly religious references" likely constituting "prayer" with the students "at midfield following the completion of . . . game[s]." *Ibid.* Second, he had led "students and coaching staff in a prayer" in the locker-room tradition that "predated [his] involvement with the program." *Id.*, at 41.

The District explained that it sought to establish "clear parameters" "going forward." *Ibid.* It instructed Mr. Kennedy to avoid any motivational "talks with students" that "include[d] religious expression, including prayer," and to avoid "suggest[ing], encourag[ing] (or discourag[ing]), or supervis[ing]" any prayers of students, which students remained free to "engage in." *Id.*, at 44. The District also explained that any religious activity on Mr. Kennedy's part must be "nondemonstrative (*i.e.*, not outwardly discernible as religious activity)" if "students are also engaged in religious conduct" in order to "avoid the perception of endorsement." *Id.*, at 45. In offering these directives, the District appealed to what it called a "direct tension between" the "Establishment Clause" and "a school employee's [right to] free[ly] exercise" his religion. *Id.*, at 43. To resolve that "tension," the District explained, an employee's free exercise rights "must yield so far as necessary to avoid school endorsement of religious activities." *Ibid.*

After receiving the District's September 17 letter, Mr. Kennedy ended the tradition, predating him, of offering locker-room prayers. *Id.*, at 40–41, 77, 170–172. He also ended his practice of incorporating religious references or

prayer into his postgame motivational talks to his team on the field. See *ibid.* Mr. Kennedy further felt pressured to abandon his practice of saying his own quiet, on-field post-game prayer. See *id.*, at 172. Driving home after a game, however, Mr. Kennedy felt upset that he had "broken [his] commitment to God" by not offering his own prayer, so he turned his car around and returned to the field. *Ibid.* By that point, everyone had left the stadium, and he walked to the 50-yard line and knelt to say a brief prayer of thanks. See *ibid.*

On October 14, through counsel, Mr. Kennedy sent a letter to school officials informing them that, because of his "sincerely-held religious beliefs," he felt "compelled" to offer a "post-game personal prayer" of thanks at midfield. *Id.*, at 62–63, 172. He asked the District to allow him to continue that "private religious expression" alone. *Id.*, at 62. Consistent with the District's policy, see *id.*, at 48, Mr. Kennedy explained that he "neither requests, encourages, nor discourages students from participating in" these prayers, *id.*, at 64. Mr. Kennedy emphasized that he sought only the opportunity to "wai[t] until the game is over and the players have left the field and then wal[k] to mid-field to say a short, private, personal prayer." *Id.*, at 69. He "told everybody" that it would be acceptable to him to pray "when the kids went away from [him]." *Id.*, at 292. He later clarified that this meant he was even willing to say his "prayer while the players were walking to the locker room" or "bus," and then catch up with his team. *Id.*, at 280–282; see also *id.*, at 59. However, Mr. Kennedy objected to the logical implication of the District's September 17 letter, which he understood as banning him "from bowing his head" in the vicinity of students, and as requiring him to "flee the scene if students voluntarily [came] to the same area" where he was praying. *Id.*, at 70. After all, District policy prohibited him from "discourag[ing]" independent student decisions to pray. *Id.*, at 44.

On October 16, shortly before the game that day, the District responded with another letter. See *id.*, at 76. The District acknowledged that Mr. Kennedy "ha[d] complied" with the "directives" in its September 17 letter. *Id.*, at 77. Yet instead of accommodating Mr. Kennedy's request to offer a brief prayer on the field while students were busy with other activities—whether heading to the locker room, boarding the bus, or perhaps singing the school fight song—the District issued an ultimatum. It forbade Mr. Kennedy from engaging in "any overt actions" that could "appea[r] to a reasonable observer to endorse . . . prayer . . . while he is on duty as a District-paid coach." *Id.*, at 81. The District did so because it judged that anything less would lead it to violate the Establishment Clause. *Ibid.*

B

After receiving this letter, Mr. Kennedy offered a brief prayer following the October 16 game. See *id.*, at 90. When he bowed his head at midfield after the game, "most [Bremerton] players were . . . engaged in the traditional singing of the school fight song to the audience." *Ibid.* Though Mr. Kennedy was alone when he began to pray, players from the other team and members of the community joined him before he finished his prayer. See *id.*, at 82, 297.

This event spurred media coverage of Mr. Kennedy's dilemma and a public response from the District. The District placed robocalls to parents to inform them that public access to the field is forbidden; it posted signs and made announcements at games saying the same thing; and it had the Bremerton Police secure the field in future games. *Id.*, at 100–101, 354–355. Subsequently, the District superintendent explained in an October 20 email to the leader of a state association of school administrators that "the coach moved on from leading prayer with kids, to taking a silent prayer at the 50 yard line." *Id.*, at 83. The official with whom the superintendent corresponded acknowledged that

the "use of a silent prayer changes the equation a bit." *Ibid.* On October 21, the superintendent further observed to a state official that "[t]he issue is quickly changing as it has shifted from leading prayer with student athletes, to a coaches [*sic*] right to conduct" his own prayer "on the 50 yard line." *Id.*, at 88.

On October 23, shortly before that evening's game, the District wrote Mr. Kennedy again. It expressed "appreciation" for his "efforts to comply" with the District's directives, including avoiding "on-the-job prayer with players in the . . . football program, both in the locker room prior to games as well as on the field immediately following games." *Id.*, at 90. The letter also admitted that, during Mr. Kennedy's recent October 16 postgame prayer, his students were otherwise engaged and not praying with him, and that his prayer was "fleeting." *Id.*, at 90, 93. Still, the District explained that a "reasonable observer" could think government endorsement of religion had occurred when a "District employee, on the field only by virtue of his employment with the District, still on duty" engaged in "overtly religious conduct." *Id.*, at 91, 93. The District thus made clear that the only option it would offer Mr. Kennedy was to allow him to pray after a game in a "private location" behind closed doors and "not observable to students or the public." *Id.*, at 93–94.

After the October 23 game ended, Mr. Kennedy knelt at the 50-yard line, where "no one joined him," and bowed his head for a "brief, quiet prayer." 991 F. 3d, at 1019; App. 173, 236–239. The superintendent informed the District's board that this prayer "moved closer to what we want," but nevertheless remained "unconstitutional." *Id.*, at 96. After the final relevant football game on October 26, Mr. Kennedy again knelt alone to offer a brief prayer as the players engaged in postgame traditions. 443 F. Supp. 3d 1223, 1231 (WD Wash. 2020); App. to Pet. for Cert. 182. While he was praying, other adults gathered around him on the field. See

443 F. Supp. 3d, at 1231; App. 97. Later, Mr. Kennedy re-
joined his players for a postgame talk, after they had fin-
ished singing the school fight song. 443 F. Supp. 3d, at
1231; App. 103.

C

Shortly after the October 26 game, the District placed Mr.
Kennedy on paid administrative leave and prohibited him
from "participat[ing], in any capacity, in . . . football pro-
gram activities." *Ibid.* In a letter explaining the reasons
for this disciplinary action, the superintendent criticized
Mr. Kennedy for engaging in "public and demonstrative re-
ligious conduct while still on duty as an assistant coach" by
offering a prayer following the games on October 16, 23, and
26. *Id.*, at 102. The letter did not allege that Mr. Kennedy
performed these prayers with students, and it acknowl-
edged that his prayers took place while students were en-
gaged in unrelated postgame activities. *Id.*, at 103. Addi-
tionally, the letter faulted Mr. Kennedy for not being
willing to pray behind closed doors. *Id.*, at 102.

In an October 28 Q&A document provided to the public,
the District admitted that it possessed "no evidence that
students have been directly coerced to pray with Kennedy."
*Id.*, at 105. The Q&A also acknowledged that Mr. Kennedy
"ha[d] complied" with the District's instruction to refrain
from his "prior practices of leading players in a pre-game
prayer in the locker room or leading players in a post-game
prayer immediately following games." *Ibid.* But the Q&A
asserted that the District could not allow Mr. Kennedy to
"engage in a public religious display." *Id.*, at 105, 107, 110.
Otherwise, the District would "violat[e] the . . . Establish-
ment Clause" because "reasonable . . . students and at-
tendees" might perceive the "district [as] endors[ing] . . . re-
ligion." *Id.*, at 105.

While Mr. Kennedy received "uniformly positive evalua-
tions" every other year of his coaching career, after the 2015

season ended in November, the District gave him a poor performance evaluation. *Kennedy* v. *Bremerton School Dist.*, 869 F. 3d 813, 820 (CA9 2017). The evaluation advised against rehiring Mr. Kennedy on the grounds that he "'failed to follow district policy'" regarding religious expression and "'failed to supervise student-athletes after games.'" *Ibid.* Mr. Kennedy did not return for the next season. *Ibid.*

## II
### A

After these events, Mr. Kennedy sued in federal court, alleging that the District's actions violated the First Amendment's Free Speech and Free Exercise Clauses. App. 145, 160–164. He also moved for a preliminary injunction requiring the District to reinstate him. The District Court denied that motion, concluding that a "reasonable observer . . . would have seen him as . . . leading an orchestrated session of faith." App. to Pet. for Cert. 303. Indeed, if the District had not suspended him, the court agreed, it might have violated the Constitution's Establishment Clause. See *id.*, at 302–303. On appeal, the Ninth Circuit affirmed. *Kennedy*, 869 F. 3d, at 831.

Following the Ninth Circuit's ruling, Mr. Kennedy sought certiorari in this Court. The Court denied the petition. But JUSTICE ALITO, joined by three other Members of the Court, issued a statement stressing that "denial of certiorari does not signify that the Court necessarily agrees with the decision . . . below." *Kennedy* v. *Bremerton School Dist.*, 586 U. S. ___, ___ (2019) (slip op., at 1). JUSTICE ALITO expressed concerns with the lower courts' decisions, including the possibility that, under their reasoning, teachers might be "ordered not to engage in any 'demonstrative' conduct of a religious nature" within view of students, even to the point of being forbidden from "folding their hands or bowing their heads in prayer" before lunch. *Id.*, at ___

(slip op., at 4).

### B

After the case returned to the District Court, the parties engaged in discovery and eventually brought cross-motions for summary judgment. At the end of that process, the District Court found that the "'sole reason'" for the District's decision to suspend Mr. Kennedy was its perceived "risk of constitutional liability" under the Establishment Clause for his "religious conduct" after the October 16, 23, and 26 games. 443 F. Supp. 3d, at 1231.

The court found that reason persuasive too. Rejecting Mr. Kennedy's free speech claim, the court concluded that because Mr. Kennedy "was hired precisely to occupy" an "influential role for student athletes," any speech he uttered was offered in his capacity as a government employee and unprotected by the First Amendment. *Id.*, at 1237. Alternatively, even if Mr. Kennedy's speech qualified as private speech, the District Court reasoned, the District properly suppressed it. Had it done otherwise, the District would have invited "an Establishment Clause violation." *Ibid.* Turning to Mr. Kennedy's free exercise claim, the District Court held that, even if the District's policies restricting his religious exercise were not neutral toward religion or generally applicable, the District had a compelling interest in prohibiting his postgame prayers, because, once more, had it "allow[ed]" them it "would have violated the Establishment Clause." *Id.*, at 1240.

### C

The Ninth Circuit affirmed. It agreed with the District Court that Mr. Kennedy's speech qualified as government rather than private speech because "his expression on the field—a location that he only had access to because of his employment—during a time when he was generally tasked

with communicating with students, was speech as a government employee." 991 F. 3d, at 1015. Like the District Court, the Ninth Circuit further reasoned that, "even if we were to assume . . . that Kennedy spoke as a private citizen," the District had an "adequate justification" for its actions. *Id.*, at 1016. According to the court, "Kennedy's on-field religious activity," coupled with what the court called "his pugilistic efforts to generate publicity in order to gain approval of those on-field religious activities," were enough to lead an "objective observer" to conclude that the District "endorsed Kennedy's religious activity by not stopping the practice." *Id.*, at 1017–1018. And that, the court held, would amount to a violation of the Establishment Clause. *Ibid.*

The Court of Appeals rejected Mr. Kennedy's free exercise claim for similar reasons. The District "concede[d]" that its policy that led to Mr. Kennedy's suspension was not "neutral and generally applicable" and instead "restrict[ed] Kennedy's religious conduct because the conduct [was] religious." *Id.*, at 1020. Still, the court ruled, the District "had a compelling state interest to avoid violating the Establishment Clause," and its suspension was narrowly tailored to vindicate that interest. *Id.*, at 1020–1021.

Later, the Ninth Circuit denied a petition to rehear the case en banc over the dissents of 11 judges. 4 F. 4th 910, 911 (2021). Among other things, the dissenters argued that the panel erred by holding that a failure to discipline Mr. Kennedy would have led the District to violate the Establishment Clause. Several dissenters noted that the panel's analysis rested on *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), and its progeny for the proposition that the Establishment Clause is implicated whenever a hypothetical reasonable observer could conclude the government endorses religion. 4 F. 4th, at 945–947 (opinion of R. Nelson, J.). These dissenters argued that this Court has long since

abandoned that "ahistorical, atextual" approach to discerning "Establishment Clause violations"; they observed that other courts around the country have followed suit by renouncing it too; and they contended that the panel should have likewise "recognized *Lemon*'s demise and wisely left it dead." *Ibid.*, and n. 3. We granted certiorari. 595 U. S. \_\_\_ (2022).

## III

Now before us, Mr. Kennedy renews his argument that the District's conduct violated both the Free Exercise and Free Speech Clauses of the First Amendment. These Clauses work in tandem. Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities. See, *e.g.*, *Widmar* v. *Vincent*, 454 U. S. 263, 269, n. 6 (1981); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 841 (1995). That the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent. See, *e.g.*, A Memorial and Remonstrance Against Religious Assessments, in Selected Writings of James Madison 21, 25 (R. Ketcham ed. 2006). "[I]n Anglo–American history, . . . government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 760 (1995).

Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law. See, *e.g.*, *Fulton* v. *Philadelphia*, 593 U. S. \_\_\_, \_\_\_–\_\_\_, \_\_\_ (2021)

(slip op., at 4–5, 13); *Reed* v. *Town of Gilbert*, 576 U. S. 155, 171 (2015); *Garcetti* v. *Ceballos*, 547 U. S. 410, 418 (2006); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993); *Sherbert* v. *Verner*, 374 U. S. 398, 403 (1963).  We begin by examining whether Mr. Kennedy has discharged his burdens, first under the Free Exercise Clause, then under the Free Speech Clause.

### A

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. Amdt. 1.  This Court has held the Clause applicable to the States under the terms of the Fourteenth Amendment. *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940).  The Clause protects not only the right to harbor religious beliefs inwardly and secretly.  It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through "the performance of (or abstention from) physical acts." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990).

Under this Court's precedents, a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Id.*, at 879–881.  Should a plaintiff make a showing like that, this Court will find a First Amendment violation unless the government can satisfy "strict scrutiny" by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest. *Lukumi*, 508 U. S., at 546.[1]

----

[1] A plaintiff may also prove a free exercise violation by showing that "official expressions of hostility" to religion accompany laws or policies burdening religious exercise; in cases like that we have "set aside" such policies without further inquiry. *Masterpiece Cakeshop, Ltd.* v. *Colorado*

That Mr. Kennedy has discharged his burdens is effectively undisputed. No one questions that he seeks to engage in a sincerely motivated religious exercise. The exercise in question involves, as Mr. Kennedy has put it, giving "thanks through prayer" briefly and by himself "on the playing field" at the conclusion of each game he coaches. App. 168, 171. Mr. Kennedy has indicated repeatedly that he is willing to "wai[t] until the game is over and the players have left the field" to "wal[k] to mid-field to say [his] short, private, personal prayer." *Id.*, at 69; see also *id.*, at 280, 282. The contested exercise before us does not involve leading prayers with the team or before any other captive audience. Mr. Kennedy's "religious beliefs do not require [him] to lead any prayer . . . involving students." *Id.*, at 170. At the District's request, he voluntarily discontinued the school tradition of locker-room prayers and his postgame religious talks to students. The District disciplined him *only* for his decision to persist in praying quietly without his players after three games in October 2015. See Parts I–B and I–C, *supra.*

Nor does anyone question that, in forbidding Mr. Kennedy's brief prayer, the District failed to act pursuant to a neutral and generally applicable rule. A government policy will not qualify as neutral if it is "specifically directed at . . . religious practice." *Smith*, 494 U. S., at 878. A policy can fail this test if it "discriminate[s] on its face," or if a religious exercise is otherwise its "object." *Lukumi*, 508 U. S., at 533; see also *Smith*, 494 U. S., at 878. A government policy will fail the general applicability requirement if it "prohibits re-

---

*Civil Rights Comm'n*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 18). To resolve today's case, however, we have no need to consult that test. Likewise, while the test we do apply today has been the subject of some criticism, see, *e.g.*, *Fulton* v. *Philadelphia*, 593 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 5), we have no need to engage with that debate today because no party has asked us to do so.

ligious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it provides "a mechanism for individualized exemptions." *Fulton*, 593 U. S., at ___ (slip op., at 6). Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny. See *Lukumi*, 508 U. S., at 546.

In this case, the District's challenged policies were neither neutral nor generally applicable. By its own admission, the District sought to restrict Mr. Kennedy's actions at least in part because of their religious character. As it put it in its September 17 letter, the District prohibited "any overt actions on Mr. Kennedy's part, appearing to a reasonable observer to endorse even voluntary, student-initiated prayer." App. 81. The District further explained that it could not allow "an employee, while still on duty, to engage in *religious* conduct." *Id.*, at 106 (emphasis added). Prohibiting a religious practice was thus the District's unquestioned "object." The District candidly acknowledged as much below, conceding that its policies were "not neutral" toward religion. 991 F. 3d, at 1020.

The District's challenged policies also fail the general applicability test. The District's performance evaluation after the 2015 football season advised against rehiring Mr. Kennedy on the ground that he "failed to supervise student-athletes after games." App. 114. But, in fact, this was a bespoke requirement specifically addressed to Mr. Kennedy's religious exercise. The District permitted other members of the coaching staff to forgo supervising students briefly after the game to do things like visit with friends or take personal phone calls. App. 205; see also Part I–B, *supra.* Thus, any sort of postgame supervisory requirement was not applied in an evenhanded, across-the-board way. Again recognizing as much, the District conceded before the Ninth Circuit that its challenged directives were not "generally applicable." 991 F. 3d, at 1020.

## B

When it comes to Mr. Kennedy's free speech claim, our precedents remind us that the First Amendment's protections extend to "teachers and students," neither of whom "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969); see also *Lane* v. *Franks*, 573 U. S. 228, 231 (2014). Of course, none of this means the speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish. In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages.

To account for the complexity associated with the interplay between free speech rights and government employment, this Court's decisions in *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968), *Garcetti*, 547 U. S. 410, and related cases suggest proceeding in two steps. The first step involves a threshold inquiry into the nature of the speech at issue. If a public employee speaks "pursuant to [his or her] official duties," this Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech. *Id.*, at 421.

At the same time and at the other end of the spectrum, when an employee "speaks as a citizen addressing a matter of public concern," our cases indicate that the First Amendment may be implicated and courts should proceed to a second step. *Id.*, at 423. At this second step, our cases suggest that courts should attempt to engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Ibid.* Among other things, courts at this

second step have sometimes considered whether an employee's speech interests are outweighed by "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.*, at 417 (quoting *Pickering*, 391 U. S., at 568).

Both sides ask us to employ at least certain aspects of this *Pickering–Garcetti* framework to resolve Mr. Kennedy's free speech claim. They share additional common ground too. They agree that Mr. Kennedy's speech implicates a matter of public concern. See App. to Pet. for Cert. 183; Brief for Respondent 44. They also appear to accept, at least for argument's sake, that Mr. Kennedy's speech does not raise questions of academic freedom that may or may not involve "additional" First Amendment "interests" beyond those captured by this framework. *Garcetti*, 547 U. S., at 425; see also *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 603 (1967); Brief for Petitioner 26, n. 2. At the first step of the *Pickering–Garcetti* inquiry, the parties' disagreement thus turns out to center on one question alone: Did Mr. Kennedy offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?

Our cases offer some helpful guidance for resolving this question. In *Garcetti*, the Court concluded that a prosecutor's internal memorandum to a supervisor was made "pursuant to [his] official duties," and thus ineligible for First Amendment protection. 547 U. S., at 421. In reaching this conclusion, the Court relied on the fact that the prosecutor's speech "fulfill[ed] a responsibility to advise his supervisor about how best to proceed with a pending case." *Ibid.* In other words, the prosecutor's memorandum was government speech because it was speech the government "itself ha[d] commissioned or created" and speech the employee was expected to deliver in the course of carrying out his job. *Id.*, at 422.

By contrast, in *Lane* a public employer sought to terminate an employee after he testified at a criminal trial about matters involving his government employment. 573 U. S., at 233. The Court held that the employee's speech was protected by the First Amendment. *Id.*, at 231. In doing so, the Court held that the fact the speech touched on matters related to public employment was not enough to render it government speech. *Id.*, at 239–240. Instead, the Court explained, the "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id.*, at 240. It is an inquiry this Court has said should be undertaken "practical[ly]," rather than with a blinkered focus on the terms of some formal and capacious written job description. *Garcetti*, 547 U. S., at 424. To proceed otherwise would be to allow public employers to use "excessively broad job descriptions" to subvert the Constitution's protections. *Ibid.*

Applying these lessons here, it seems clear to us that Mr. Kennedy has demonstrated that his speech was private speech, not government speech. When Mr. Kennedy uttered the three prayers that resulted in his suspension, he was not engaged in speech "ordinarily within the scope" of his duties as a coach. *Lane*, 573 U. S., at 240. He did not speak pursuant to government policy. He was not seeking to convey a government-created message. He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach. See Part I–B, *supra*. Simply put: Mr. Kennedy's prayers did not "ow[e] their] existence" to Mr. Kennedy's responsibilities as a public employee. *Garcetti*, 547 U. S., at 421.

The timing and circumstances of Mr. Kennedy's prayers confirm the point. During the postgame period when these prayers occurred, coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands.

App. 205; see Part I–B, *supra*. We find it unlikely that Mr.
Kennedy was fulfilling a responsibility imposed by his em-
ployment by praying during a period in which the District
has acknowledged that its coaching staff was free to engage
in all manner of private speech. That Mr. Kennedy offered
his prayers when students were engaged in other activities
like singing the school fight song further suggests that
those prayers were not delivered as an address to the team,
but instead in his capacity as a private citizen. Nor is it
dispositive that Mr. Kennedy's prayers took place "within
the office" environment—here, on the field of play. *Garcetti*,
547 U. S., at 421. Instead, what matters is whether Mr.
Kennedy offered his prayers while acting within the scope
of his duties as a coach. And taken together, both the sub-
stance of Mr. Kennedy's speech and the circumstances sur-
rounding it point to the conclusion that he did not.

In reaching its contrary conclusion, the Ninth Circuit
stressed that, as a coach, Mr. Kennedy served as a role
model "clothed with the mantle of one who imparts
knowledge and wisdom." 991 F. 3d, at 1015. The court em-
phasized that Mr. Kennedy remained on duty after games.
*Id.*, at 1016. Before us, the District presses the same argu-
ments. See Brief for Respondent 24. And no doubt they
have a point. Teachers and coaches often serve as vital role
models. But this argument commits the error of positing
an "excessively broad job descriptio[n]" by treating every-
thing teachers and coaches say in the workplace as govern-
ment speech subject to government control. *Garcetti*, 547
U. S., at 424. On this understanding, a school could fire a
Muslim teacher for wearing a headscarf in the classroom or
prohibit a Christian aide from praying quietly over her
lunch in the cafeteria. Likewise, this argument ignores the
District Court's conclusion (and the District's concession)
that Mr. Kennedy's actual job description left time for a pri-
vate moment after the game to call home, check a text, so-

cialize, or engage in any manner of secular activities. Others working for the District were free to engage briefly in personal speech and activity. App. 205; see Part I–B, *supra.* That Mr. Kennedy chose to use the same time to pray does not transform his speech into government speech. To hold differently would be to treat religious expression as second-class speech and eviscerate this Court's repeated promise that teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U. S., at 506.

Of course, acknowledging that Mr. Kennedy's prayers represented his own private speech does not end the matter. So far, we have recognized only that Mr. Kennedy has carried his threshold burden. Under the *Pickering–Garcetti* framework, a second step remains where the government may seek to prove that its interests as employer outweigh even an employee's private speech on a matter of public concern. See *Lane*, 573 U. S., at 236, 242.[2]

## IV

Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District. Under the Free Exercise Clause, a government entity normally must satisfy at least "strict scrutiny," showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end. See *Lukumi*, 508 U. S., at 533; n. 1, *supra.* A similar standard generally obtains under the Free Speech Clause. See *Reed*, 576 U. S., at 171. The District, however, asks us to apply to Mr. Kennedy's claims the

---

[2] Because our analysis and the parties' concessions lead to the conclusion that Mr. Kennedy's prayer constituted private speech on a matter of public concern, we do not decide whether the Free Exercise Clause may sometimes demand a different analysis at the first step of the *Pickering–Garcetti* framework.

more lenient second-step *Pickering–Garcetti* test, or alternatively intermediate scrutiny.  See Brief for Respondent 44–48.  Ultimately, however, it does not matter which standard we apply.  The District cannot sustain its burden under any of them.[3]

A

As we have seen, the District argues that its suspension of Mr. Kennedy was essential to avoid a violation of the Establishment Clause.  *Id.*, at 35–42.  On its account, Mr. Kennedy's prayers might have been protected by the Free Exercise and Free Speech Clauses.  But his rights were in "direct tension" with the competing demands of the Establishment Clause.  App. 43.  To resolve that clash, the District reasoned, Mr. Kennedy's rights had to "yield."  *Ibid.*  The Ninth Circuit pursued this same line of thinking, insisting that the District's interest in avoiding an Establishment Clause violation "'trump[ed]'" Mr. Kennedy's rights to religious exercise and free speech.  991 F. 3d, at 1017; see also *id.*, at 1020–1021.

But how could that be?  It is true that this Court and others often refer to the "Establishment Clause," the "Free Exercise Clause," and the "Free Speech Clause" as separate units.  But the three Clauses appear in the same sentence of the same Amendment:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech."  Amdt. 1.  A natural reading of that sentence would seem to suggest the Clauses have "complementary" purposes, not warring ones where one Clause is always sure to prevail

---

[3] It seems, too, that it is only here where our disagreement with the dissent begins in earnest.  We do not understand our colleagues to contest that Mr. Kennedy has met his burdens under either the Free Exercise or Free Speech Clause, but only to suggest the District has carried its own burden "to establish that its policy prohibiting Kennedy's public prayers was the least restrictive means of furthering a compelling state interest."  *Post*, at 22 (opinion of SOTOMAYOR, J.).

over the others. See *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 13, 15 (1947).

The District arrived at a different understanding this way. It began with the premise that the Establishment Clause is offended whenever a "reasonable observer" could conclude that the government has "endorse[d]" religion. App. 81. The District then took the view that a "reasonable observer" could think it "endorsed Kennedy's religious activity by not stopping the practice." 991 F. 3d, at 1018; see also App. 80–81; Parts I and II, *supra*. On the District's account, it did not matter whether the Free Exercise Clause protected Mr. Kennedy's prayer. It did not matter if his expression was private speech protected by the Free Speech Clause. It did not matter that the District never actually endorsed Mr. Kennedy's prayer, no one complained that it had, and a strong public reaction only followed after the District sought to ban Mr. Kennedy's prayer. Because a reasonable observer could (mistakenly) infer that by allowing the prayer the District endorsed Mr. Kennedy's message, the District felt it had to act, even if that meant suppressing otherwise protected First Amendment activities. In this way, the District effectively created its own "vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other," placed itself in the middle, and then chose its preferred way out of its self-imposed trap. See *Pinette*, 515 U. S., at 768 (plurality opinion); *Shurtleff* v. *Boston*, 596 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (GORSUCH, J., concurring in judgment) (slip op., at 4–5).

To defend its approach, the District relied on *Lemon* and its progeny. See App. 43–45. In upholding the District's actions, the Ninth Circuit followed the same course. See Part II–C, *supra*. And, to be sure, in *Lemon* this Court attempted a "grand unified theory" for assessing Establishment Clause claims. *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_, \_\_\_ (2019) (plurality opinion) (slip

op., at 24). That approach called for an examination of a law's purposes, effects, and potential for entanglement with religion. *Lemon*, 403 U. S., at 612–613. In time, the approach also came to involve estimations about whether a "reasonable observer" would consider the government's challenged action an "endorsement" of religion. See, *e.g.*, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 593 (1989); *id.*, at 630 (O'Connor, J., concurring in part and concurring in judgment); *Shurtleff*, 596 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 3).

What the District and the Ninth Circuit overlooked, however, is that the "shortcomings" associated with this "ambitiou[s]," abstract, and ahistorical approach to the Establishment Clause became so "apparent" that this Court long ago abandoned *Lemon* and its endorsement test offshoot. *American Legion*, 588 U. S., at ___–___ (plurality opinion) (slip op., at 12–13); see also *Town of Greece* v. *Galloway*, 572 U. S. 565, 575–577 (2014). The Court has explained that these tests "invited chaos" in lower courts, led to "differing results" in materially identical cases, and created a "minefield" for legislators. *Pinette*, 515 U. S., at 768–769, n. 3 (plurality opinion) (emphasis deleted). This Court has since made plain, too, that the Establishment Clause does not include anything like a "modified heckler's veto, in which . . . religious activity can be proscribed" based on "'perceptions'" or "'discomfort.'" *Good News Club* v. *Milford Central School*, 533 U. S. 98, 119 (2001) (emphasis deleted). An Establishment Clause violation does not automatically follow whenever a public school or other government entity "fail[s] to censor" private religious speech. *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 250 (1990) (plurality opinion). Nor does the Clause "compel the government to purge from the public sphere" anything an objective observer could reasonably infer endorses or "partakes of the religious." *Van Orden* v.

*Perry*, 545 U. S. 677, 699 (2005) (BREYER, J., concurring in judgment). In fact, just this Term the Court unanimously rejected a city's attempt to censor religious speech based on *Lemon* and the endorsement test. See *Shurtleff*, 596 U. S., at \_\_\_–\_\_\_ (slip op., at 1–2); *id.*, at \_\_\_ (ALITO, J., concurring in judgment) (slip op., at 1); *id.*, at \_\_\_, \_\_\_–\_\_\_ (opinion of GORSUCH, J.) (slip op., at 1, 4–5).[4]

In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by "'reference to historical practices and understandings.'" *Town of Greece*, 572 U. S., at 576; see also *American Legion*, 588 U. S., at \_\_\_ (plurality opinion) (slip op., at 25). "'[T]he line'" that courts and governments "must draw between the permissible and the impermissible" has to "'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Town of Greece*,

——————

[4] Nor was that decision an outlier. In the last two decades, this Court has often criticized or ignored *Lemon* and its endorsement test variation. See, *e.g.*, *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. \_\_\_ (2020); *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_ (2019); *Trump* v. *Hawaii*, 585 U. S. \_\_\_ (2018); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_ (2017); *Town of Greece* v. *Galloway*, 572 U. S. 565 (2014); *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012); *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. 125 (2011); *Hein* v. *Freedom from Religion Foundation, Inc.*, 551 U. S. 587 (2007); *id.*, at 618 (Scalia, J., concurring in judgment); *Van Orden* v. *Perry*, 545 U. S. 677 (2005); *id.*, at 689 (BREYER, J., concurring in judgment). A vast number of Justices have criticized those tests over an even longer period. See *Shurtleff* v. *Boston*, 596 U. S. \_\_\_, at \_\_\_–\_\_\_, and nn. 9–10 (2022) (GORSUCH, J., concurring in judgment) (slip op., at 7–8, and nn. 9–10) (collecting opinions authored or joined by ROBERTS and Rehnquist, C. J., and THOMAS, BREYER, ALITO, KAVANAUGH, Stevens, O'Connor, Scalia, and Kennedy, JJ.). The point has not been lost on our lower court colleagues. See, *e.g.*, 4 F. 4th 910, 939–941 (2021) (O'Scannlain, J., respecting denial of rehearing en banc); *id.*, at 945 (R. Nelson, J., dissenting from denial of rehearing en banc); *id.*, at 947, n. 3 (collecting lower court cases from "around the country" that "have recognized *Lemon*'s demise").

572 U. S., at 577 (quoting *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 294 (1963) (Brennan, J., concurring)). An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some "'exception'" within the "Court's Establishment Clause jurisprudence." 572 U. S., at 575; see *American Legion*, 588 U. S., at ___ (plurality opinion) (slip op., at 25); *Torcaso* v. *Watkins*, 367 U. S. 488, 490 (1961) (analyzing certain historical elements of religious establishments); *McGowan* v. *Maryland*, 366 U. S. 420, 437–440 (1961) (analyzing Sunday closing laws by looking to their "place . . . in the First Amendment's history"); *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 680 (1970) (analyzing the "history and uninterrupted practice" of church tax exemptions). The District and the Ninth Circuit erred by failing to heed this guidance.

B

Perhaps sensing that the primary theory it pursued below rests on a mistaken understanding of the Establishment Clause, the District offers a backup argument in this Court. It still contends that its Establishment Clause concerns trump Mr. Kennedy's free exercise and free speech rights. But the District now seeks to supply different reasoning for that result. Now, it says, it was justified in suppressing Mr. Kennedy's religious activity because otherwise it would have been guilty of coercing students to pray. See Brief for Respondent 34–37. And, the District says, coercing worship amounts to an Establishment Clause violation on anyone's account of the Clause's original meaning.

As it turns out, however, there is a pretty obvious reason why the Ninth Circuit did not adopt this theory in proceedings below: The evidence cannot sustain it. To be sure, this Court has long held that government may not, consistent with a historically sensitive understanding of the Estab-

lishment Clause, "make a religious observance compulsory." *Zorach* v. *Clauson*, 343 U. S. 306, 314 (1952). Government "may not coerce anyone to attend church," *ibid.*, nor may it force citizens to engage in "a formal religious exercise," *Lee* v. *Weisman*, 505 U. S. 577, 589 (1992). No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.[5] Members of this Court have sometimes disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause. Compare *Lee*, 505 U. S., at 593, with *id.*, at 640–641 (Scalia, J., dissenting). But in this case Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion.

Begin with the District's own contemporaneous description of the facts. In its correspondence with Mr. Kennedy, the District never raised coercion concerns. To the contrary, the District conceded in a public 2015 document that there was "no evidence that students [were] directly coerced to pray with Kennedy." App. 105. This is consistent with Mr. Kennedy's account too. He has repeatedly stated that he "never coerced, required, or asked any student to pray," and that he never "told any student that it was important that they participate in any religious activity." *Id.*, at 170.

Consider, too, the actual requests Mr. Kennedy made. The District did not discipline Mr. Kennedy for engaging in

_____

[5] See, *e.g.*, *Lee* v. *Weisman*, 505 U. S. 577, 640–642 (1992) (Scalia, J. dissenting); *Shurtleff*, 596 U. S., at \_\_\_–\_\_\_ (opinion of GORSUCH, J.) (slip op., at 10–13) (discussing coercion and certain other historical hallmarks of an established religion); 1 Annals of Cong. 730–731 (1789) (Madison explaining that the First Amendment aimed to prevent one or multiple sects from "establish[ing] a religion to which they would compel others to conform"); M. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2144–2146 (2003).

prayer while presenting locker-room speeches to students. That tradition predated Mr. Kennedy at the school. App. 170. And he willingly ended it, as the District has acknowledged. *Id.*, at 77, 170. He also willingly ended his practice of postgame religious talks with his team. *Id.*, at 70, 77, 170–172. The only prayer Mr. Kennedy sought to continue was the kind he had "started out doing" at the beginning of his tenure—the prayer he gave alone. *Id.*, at 293–294. He made clear that he could pray "while the kids were doing the fight song" and "take a knee by [him]self and give thanks and continue on." *Id.*, at 294. Mr. Kennedy even considered it "acceptable" to say his "prayer while the players were walking to the locker room" or "bus," and then catch up with his team. *Id.*, at 280, 282; see also *id.*, at 59 (proposing the team leave the field for the prayer). In short, Mr. Kennedy did not seek to direct any prayers to students or require anyone else to participate. His plan was to wait to pray until athletes were occupied, and he "told everybody" that's what he wished "to do." *Id.*, at 292. It was for three prayers of this sort alone in October 2015 that the District suspended him. See Parts I–B and I–C, *supra*.

Naturally, Mr. Kennedy's proposal to pray quietly by himself on the field would have meant some people would have seen his religious exercise. Those close at hand might have heard him too. But learning how to tolerate speech or prayer of all kinds is "part of learning how to live in a pluralistic society," a trait of character essential to "a tolerant citizenry." *Lee*, 505 U. S., at 590. This Court has long recognized as well that "secondary school students are mature enough . . . to understand that a school does not endorse," let alone coerce them to participate in, "speech that it merely permits on a nondiscriminatory basis." *Mergens*, 496 U. S., at 250 (plurality opinion). Of course, some will take offense to certain forms of speech or prayer they are sure to encounter in a society where those activities enjoy such robust constitutional protection. But "[o]ffense . . .

does not equate to coercion." *Town of Greece*, 572 U. S., at 589 (plurality opinion).

The District responds that, as a coach, Mr. Kennedy "wielded enormous authority and influence over the students," and students might have felt compelled to pray alongside him. Brief for Respondent 37. To support this argument, the District submits that, after Mr. Kennedy's suspension, a few parents told District employees that their sons had "participated in the team prayers only because they did not wish to separate themselves from the team." App. 356.

This reply fails too. Not only does the District rely on hearsay to advance it. For all we can tell, the concerns the District says it heard from parents were occasioned by the locker-room prayers that predated Mr. Kennedy's tenure or his postgame religious talks, all of which he discontinued at the District's request. There is no indication in the record that anyone expressed any coercion concerns to the District about the quiet, postgame prayers that Mr. Kennedy asked to continue and that led to his suspension. Nor is there any record evidence that students felt pressured to participate in these prayers. To the contrary, and as we have seen, not a single Bremerton student joined Mr. Kennedy's quiet prayers following the three October 2015 games for which he was disciplined. On October 16, those students who joined Mr. Kennedy were "'from the opposing team,'" 991 F. 3d, at 1012–1013, and thus could not have "reasonably fear[ed]" that he would decrease their "playing time" or destroy their "opportunities" if they did not "participate," Brief for Respondent 43. As for the other two relevant games, "no one joined" Mr. Kennedy on October 23. 991 F. 3d, at 1019. And only a few members of the public participated on October 26. App. 97, 314–315; see also Part I–

B, *supra.*[6]

The absence of evidence of coercion in this record leaves the District to its final redoubt. Here, the District suggests that *any* visible religious conduct by a teacher or coach should be deemed—without more and as a matter of law—impermissibly coercive on students. In essence, the District asks us to adopt the view that the only acceptable government role models for students are those who eschew any visible religious expression. See also *post*, at 16–17 (SOTOMAYOR, J., dissenting). If the argument sounds familiar, it should. Really, it is just another way of repackaging the District's earlier submission that government may script everything a teacher or coach says in the workplace. See Part III–B, *supra*. The only added twist here is the District's suggestion not only that it *may* prohibit teachers from engaging in any demonstrative religious activity, but that it *must* do so in order to conform to the Constitution.

Such a rule would be a sure sign that our Establishment Clause jurisprudence had gone off the rails. In the name of protecting religious liberty, the District would have us suppress it. Rather than respect the First Amendment's double protection for religious expression, it would have us preference secular activity. Not only could schools fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer during a break before practice. Under the District's rule, a school would be *required* to do so. It is a rule that would defy this Court's traditional understanding that permitting private speech is

---

[6] The dissent expresses concern that looking to "histor[y] an[d] tradition" to guide Establishment Clause inquiries will not afford "school administrators" sufficient guidance. *Post*, at 30. But that concern supplies no excuse to adorn the Constitution with rules not supported by its terms and the traditions undergirding them. Nor, in any event, is there any question that the District understands that coercion can be a hallmark of an Establishment Clause violation. See App. 105. The District's problem isn't a failure to identify coercion as a crucial legal consideration; it is a lack of evidence that coercion actually occurred.

not the same thing as coercing others to participate in it. See *Town of Greece*, 572 U. S., at 589 (plurality opinion). It is a rule, too, that would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been "part of learning how to live in a pluralistic society." *Lee*, 505 U. S., at 590. We are aware of no historically sound understanding of the Establishment Clause that begins to "mak[e] it necessary for government to be hostile to religion" in this way. *Zorach*, 343 U. S., at 314.

Our judgments on all these scores find support in this Court's prior cases too. In *Zorach*, for example, challengers argued that a public school program permitting students to spend time in private religious instruction off campus was impermissibly coercive. *Id.*, at 308, 311–312. The Court rejected that challenge because students were not required to attend religious instruction and there was no evidence that any employee had "us[ed] their office to persuade or force students" to participate in religious activity. *Id.*, at 311, and n. 6. What was clear there is even more obvious here—where there is no evidence anyone sought to persuade or force students to participate, and there is no formal school program accommodating the religious activity at issue.

Meanwhile, this case looks very different from those in which this Court has found prayer involving public school students to be problematically coercive. In *Lee*, this Court held that school officials violated the Establishment Clause by "including [a] clerical membe[r]" who publicly recited prayers "as part of [an] official school graduation ceremony" because the school had "in every practical sense compelled attendance and participation in" a "religious exercise." 505 U. S., at 580, 598. In *Santa Fe Independent School Dist.* v. *Doe*, the Court held that a school district violated the Establishment Clause by broadcasting a prayer "over the public address system" before each football game. 530 U. S.

290, 294 (2000). The Court observed that, while students generally were not required to attend games, attendance *was* required for "cheerleaders, members of the band, and, of course, the team members themselves." *Id.*, at 311. None of that is true here. The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. Students were not required or expected to participate. And, in fact, none of Mr. Kennedy's students did participate in any of the three October 2015 prayers that resulted in Mr. Kennedy's discipline. See App. 90, 97, 173, 236–239; Parts I–B and I–C, *supra*.[7]

C

In the end, the District's case hinges on the need to generate conflict between an individual's rights under the Free Exercise and Free Speech Clauses and its own Establishment Clause duties—and then develop some explanation why one of these Clauses in the First Amendment should "'trum[p]'" the other two. 991 F. 3d, at 1017; App. 43. But the project falters badly. Not only does the District fail to offer a sound reason to prefer one constitutional guarantee

———————

[7] Even if the personal prayers Mr. Kennedy sought to offer after games are not themselves coercive, the dissent suggests that they bear an indelible taint of coercion by association with the school's past prayer practices—some of which predated Mr. Kennedy, and all of which the District concedes he ended on request. But none of those abandoned practices formed the basis for Mr. Kennedy's suspension, and he has not sought to claim First Amendment protection for them. See *Town of Greece*, 572 U. S., at 585 (other past practices do not permanently "despoil a practice" later challenged under the Establishment Clause). Nor, contrary to the dissent, does the possibility that students might choose, unprompted, to participate in Mr. Kennedy's prayers necessarily prove them coercive. See *post*, at 18–20, 32–33. For one thing, the District has conceded that no coach may "discourag[e]" voluntary student prayer under its policies. Tr. of Oral Arg. 91. For another, Mr. Kennedy has repeatedly explained that he is willing to conduct his prayer without students—as he did after each of the games that formed the basis of his suspension—and after students head to the locker room or bus. See App. 280, 282, 292–294.

over another. It cannot even show that they are at odds. In truth, there is no conflict between the constitutional commands before us. There is only the "mere shadow" of a conflict, a false choice premised on a misconstruction of the Establishment Clause. *Schempp*, 374 U. S., at 308 (Goldberg, J., concurring). And in no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights. See, *e.g.*, *Rosenberger*, 515 U. S., at 845–846; *Good News Club*, 533 U. S., at 112–119; *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 394–395 (1993); *Widmar*, 454 U. S., at 270–275.[8]

## V

Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head. Here, a government entity sought to punish an individual for engaging in a brief, quiet, personal religious observance doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment. And the only meaningful justification the government offered for its reprisal rested on a mistaken view that it had a duty to ferret out and suppress

––––––––––

[8] Failing under its coercion theory, the District offers still another backup argument. It contends that it had to suppress Mr. Kennedy's protected First Amendment activity to ensure order at Bremerton football games. See also *post*, at 2, 8–9, 11, 34–35 (SOTOMAYOR, J., dissenting). But the District never raised concerns along these lines in its contemporaneous correspondence with Mr. Kennedy. And unsurprisingly, neither the District Court nor the Ninth Circuit invoked this rationale to justify the District's actions. Government "justification[s]" for interfering with First Amendment rights "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States* v. *Virginia*, 518 U. S. 515, 533 (1996). Nor under our Constitution does protected speech or religious exercise readily give way to a "heckler's veto." *Good News Club* v. *Milford Central School*, 533 U. S. 98, 119 (2001); *supra*, at 22–23.

religious observances even as it allows comparable secular speech.  The Constitution neither mandates nor tolerates that kind of discrimination.  Mr. Kennedy is entitled to summary judgment on his First Amendment claims.  The judgment of the Court of Appeals is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–418

_____

## JOSEPH A. KENNEDY, PETITIONER *v.* BREMERTON SCHOOL DISTRICT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2022]

JUSTICE THOMAS, concurring.

I join the Court's opinion because it correctly holds that Bremerton School District violated Joseph Kennedy's First Amendment rights. I write separately to emphasize that the Court's opinion does not resolve two issues related to Kennedy's free-exercise claim.

First, the Court refrains from deciding whether or how public employees' rights under the Free Exercise Clause may or may not be different from those enjoyed by the general public. See *ante,* at 19, n. 2. In "striking the appropriate balance" between public employees' constitutional rights and "the realities of the employment context," we have often "consider[ed] whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." *Engquist* v. *Oregon Dept. of Agriculture*, 553 U. S. 591, 600 (2008). In the free-speech context, for example, that inquiry has prompted us to distinguish between different kinds of speech; we have held that "the First Amendment protects public employee speech only when it falls within the core of First Amendment protection— speech on matters of public concern." *Ibid.* It remains an open question, however, if a similar analysis can or should apply to free-exercise claims in light of the "history" and

"tradition" of the Free Exercise Clause. *Borough of Duryea*
v. *Guarnieri*, 564 U. S. 379, 406 (2011) (Scalia, J., concur-
ring in judgment in part and dissenting in part); see also
*id.,* at 400 (THOMAS, J., concurring in judgment).

Second, the Court also does not decide what burden a gov-
ernment employer must shoulder to justify restricting an
employee's religious expression because the District had no
constitutional basis for reprimanding Kennedy under any
possibly applicable standard of scrutiny.  See *ante,* at 20.
While we have many public-employee precedents address-
ing how the interest-balancing test set out in *Pickering* v.
*Board of Ed. of Township High School Dist. 205*, *Will Cty*.,
391 U. S. 563 (1968), applies under the Free Speech Clause,
the Court has never before applied *Pickering* balancing to a
claim brought under the Free Exercise Clause.  A govern-
ment employer's burden therefore might differ depending
on which First Amendment guarantee a public employee in-
vokes.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–418

———————

## JOSEPH A. KENNEDY, PETITIONER *v.* BREMERTON SCHOOL DISTRICT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2022]

JUSTICE ALITO, concurring.

The expression at issue in this case is unlike that in any of our prior cases involving the free-speech rights of public employees. Petitioner's expression occurred while at work but during a time when a brief lull in his duties apparently gave him a few free moments to engage in private activities. When he engaged in this expression, he acted in a purely private capacity. The Court does not decide what standard applies to such expression under the Free Speech Clause but holds only that retaliation for this expression cannot be justified based on any of the standards discussed. On that understanding, I join the opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–418

_____

## JOSEPH A. KENNEDY, PETITIONER *v.* BREMERTON SCHOOL DISTRICT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2022]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, dissenting.

This case is about whether a public school must permit a school official to kneel, bow his head, and say a prayer at the center of a school event. The Constitution does not authorize, let alone require, public schools to embrace this conduct. Since *Engel* v. *Vitale*, 370 U. S. 421 (1962), this Court consistently has recognized that school officials leading prayer is constitutionally impermissible. Official-led prayer strikes at the core of our constitutional protections for the religious liberty of students and their parents, as embodied in both the Establishment Clause and the Free Exercise Clause of the First Amendment.

The Court now charts a different path, yet again paying almost exclusive attention to the Free Exercise Clause's protection for individual religious exercise while giving short shrift to the Establishment Clause's prohibition on state establishment of religion. See *Carson* v. *Makin*, 596 U. S. \_\_\_, \_\_\_ (2022) (BREYER, J., dissenting) (slip op., at 1). To the degree the Court portrays petitioner Joseph Kennedy's prayers as private and quiet, it misconstrues the facts. The record reveals that Kennedy had a longstanding practice of conducting demonstrative prayers on the 50-yard line of the football field. Kennedy consistently invited others to join his prayers and for years led student athletes

in prayer at the same time and location. The Court ignores this history. The Court also ignores the severe disruption to school events caused by Kennedy's conduct, viewing it as irrelevant because the Bremerton School District (District) stated that it was suspending Kennedy to avoid it being viewed as endorsing religion. Under the Court's analysis, presumably this would be a different case if the District had cited Kennedy's repeated disruptions of school programming and violations of school policy regarding public access to the field as grounds for suspending him. As the District did not articulate those grounds, the Court assesses only the District's Establishment Clause concerns. It errs by assessing them divorced from the context and history of Kennedy's prayer practice.

Today's decision goes beyond merely misreading the record. The Court overrules *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), and calls into question decades of subsequent precedents that it deems "offshoot[s]" of that decision. *Ante,* at 22. In the process, the Court rejects longstanding concerns surrounding government endorsement of religion and replaces the standard for reviewing such questions with a new "history and tradition" test. In addition, while the Court reaffirms that the Establishment Clause prohibits the government from coercing participation in religious exercise, it applies a nearly toothless version of the coercion analysis, failing to acknowledge the unique pressures faced by students when participating in school-sponsored activities. This decision does a disservice to schools and the young citizens they serve, as well as to our Nation's longstanding commitment to the separation of church and state. I respectfully dissent.

I

As the majority tells it, Kennedy, a coach for the District's football program, "lost his job" for "pray[ing] quietly while

his students were otherwise occupied." *Ante,* at 1. The record before us, however, tells a different story.

A

The District serves approximately 5,057 students and employs 332 teachers and 400 nonteaching personnel in Kitsap County, Washington. The county is home to Bahá'ís, Buddhists, Hindus, Jews, Muslims, Sikhs, Zoroastrians, and many denominations of Christians, as well as numerous residents who are religiously unaffiliated. See Brief for Religious and Denominational Organizations et al. as *Amici Curiae* 4.

The District first hired Kennedy in 2008, on a renewable annual contract, to serve as a part-time assistant coach for the varsity football team and head coach for the junior varsity team at Bremerton High School (BHS). Kennedy's job description required him to "[a]ccompany and direct" all home and out-of-town games to which he was assigned, overseeing preparation and transportation before games, being "[r]esponsible for player behavior both on and off the field," supervising dressing rooms, and "secur[ing] all facilities at the close of each practice." App. 32–34, 36. His duties encompassed "supervising student activities immediately following the completion of the game" until the students were released to their parents or otherwise allowed to leave. *Id.,* at 133.

The District also set requirements for Kennedy's interactions with players, obliging him, like all coaches, to "exhibit sportsmanlike conduct at all times," "utilize positive motivational strategies to encourage athletic performance," and serve as a "mentor and role model for the student athletes." *Id.,* at 56. In addition, Kennedy's position made him responsible for interacting with members of the community. In this capacity, the District required Kennedy and other coaches to "maintain positive media relations," "always approach officials with composure" with the expectation that

they were "constantly being observed by others," and "communicate effectively" with parents. *Ibid.*

Finally, District coaches had to "[a]dhere to [District] policies and administrative regulations" more generally. *Id.,* at 30–31. As relevant here, the District's policy on "Religious-Related Activities and Practices" provided that "[s]chool staff shall neither encourage or discourage a student from engaging in non-disruptive oral or silent prayer or any other form of devotional activity" and that "[r]eligious services, programs or assemblies shall not be conducted in school facilities during school hours or in connection with any school sponsored or school related activity." *Id.,* at 26–28.

B

In September 2015, a coach from another school's football team informed BHS' principal that Kennedy had asked him and his team to join Kennedy in prayer. The other team's coach told the principal that he thought it was "'cool'" that the District "'would allow [its] coaches to go ahead and invite other teams' coaches and players to pray after a game.'" *Id.,* at 229.

The District initiated an inquiry into whether its policy on Religious-Related Activities and Practices had been violated. It learned that, since his hiring in 2008, Kennedy had been kneeling on the 50-yard line to pray immediately after shaking hands with the opposing team. Kennedy recounted that he initially prayed alone and that he never asked any student to join him. Over time, however, a majority of the team came to join him, with the numbers varying from game to game. Kennedy's practice evolved into postgame talks in which Kennedy would hold aloft student helmets and deliver speeches with "overtly religious references," which Kennedy described as prayers, while the players kneeled around him. *Id.,* at 40. The District also learned that students had prayed in the past in the locker



Photograph of J. Kennedy standing in group of kneeling players.

room prior to games, before Kennedy was hired, but that Kennedy subsequently began leading those prayers too.

While the District's inquiry was pending, its athletic director attended BHS' September 11, 2015, football game and told Kennedy that he should not be conducting prayers with players. After the game, while the athletic director watched, Kennedy led a prayer out loud, holding up a player's helmet as the players kneeled around him. While riding the bus home with the team, Kennedy posted on Facebook that he thought he might have just been fired for praying.

On September 17, the District's superintendent sent Kennedy a letter informing him that leading prayers with students on the field and in the locker room would likely be found to violate the Establishment Clause, exposing the District to legal liability. The District acknowledged that

Kennedy had "not actively encouraged, or required, participation" but emphasized that "school staff may not indirectly encourage students to engage in religious activity" or "endors[e]" religious activity; rather, the District explained, staff "must remain neutral" "while performing their job duties." *Id.,* at 41–43. The District instructed Kennedy that any motivational talks to students must remain secular, "so as to avoid alienation of any team member." *Id*., at 44.

The District reiterated that "all District staff are free to engage in religious activity, including prayer, so long as it does not interfere with job responsibilities." *Id.*, at 45. To avoid endorsing student religious exercise, the District instructed that such activity must be nondemonstrative or conducted separately from students, away from student activities. *Ibid*. The District expressed concern that Kennedy had continued his midfield prayer practice at two games after the District's athletic director and the varsity team's head coach had instructed him to stop. *Id.,* at 40–41.

Kennedy stopped participating in locker room prayers and, after a game the following day, gave a secular speech. He returned to pray in the stadium alone after his duties were over and everyone had left the stadium, to which the District had no objection. Kennedy then hired an attorney, who, on October 14, sent a letter explaining that Kennedy was "motivated by his sincerely-held religious beliefs to pray following each football game." *Id.,* at 63. The letter claimed that the District had required that Kennedy "flee from students if they voluntarily choose to come to a place where he is privately praying during personal time," referring to the 50-yard line of the football field immediately following the conclusion of a game. *Id.,* at 70. Kennedy requested that the District simply issue a "clarif[ication] that the prayer is [Kennedy's] private speech" and that the District not "interfere" with students joining Kennedy in prayer. *Id.*, at 71. The letter further announced that Kennedy would resume his 50-yard-line prayer practice the

next day after the October 16 homecoming game.[1]

Before the homecoming game, Kennedy made multiple media appearances to publicize his plans to pray at the 50-yard line, leading to an article in the Seattle News and a local television broadcast about the upcoming homecoming game. In the wake of this media coverage, the District began receiving a large number of emails, letters, and calls, many of them threatening.

The District responded to Kennedy's letter before the game on October 16. It emphasized that Kennedy's letter evinced "materia[l] misunderstand[ings]" of many of the facts at issue. *Id.,* at 76. For instance, Kennedy's letter asserted that he had not invited anyone to pray with him; the District noted that that might be true of Kennedy's September 17 prayer specifically, but that Kennedy had acknowledged inviting others to join him on many previous occasions. The District's September 17 letter had explained that Kennedy traditionally held up helmets from the BHS and opposing teams while players from each team kneeled around him. While Kennedy's letter asserted that his prayers "occurr[ed] 'on his own time,' after his duties as a District employee had ceased," the District pointed out that Kennedy "remain[ed] on duty" when his prayers occurred "immediately following completion of the football game, when students are still on the football field, in uniform, under the stadium lights, with the audience still in attendance, and while Mr. Kennedy is still in his District-issued and District-logoed attire." *Id.*, at 78 (emphasis deleted).

———————

[1] The Court recounts that Kennedy was "willing to say his 'prayer while the players were walking to the locker room' or 'bus,' and then catch up with his team." *Ante,* at 4 (quoting App. 280–282); see also *ante,* at 5. Kennedy made the quoted remarks, however, only during his deposition in the underlying litigation, stating in response to a question that such timing would have been "physically possible" and "possibly" have been acceptable to him, but that he had never "discuss[ed] with the District whether that was a possibility for [him] to do" and had "no idea" whether his lawyers raised it with the District. App. 280.

The District further noted that "[d]uring the time following completion of the game, until players are released to their parents or otherwise allowed to leave the event, Mr. Kennedy, like all coaches, is clearly on duty and paid to continue supervision of students." *Id.*, at 79.

The District stated that it had no objection to Kennedy returning to the stadium when he was off duty to pray at the 50-yard line, nor with Kennedy praying while on duty if it did not interfere with his job duties or suggest the District's endorsement of religion. The District explained that its establishment concerns were motivated by the specific facts at issue, because engaging in prayer on the 50-yard line immediately after the game finished would appear to be an extension of Kennedy's "prior, long-standing and well-known history of leading students in prayer" on the 50-yard line after games. *Id.*, at 81. The District therefore reaffirmed its prior directives to Kennedy.

On October 16, after playing of the game had concluded, Kennedy shook hands with the opposing team, and as advertised, knelt to pray while most BHS players were singing the school's fight song. He quickly was joined by coaches and players from the opposing team. Television news cameras surrounded the group.[2] Members of the public rushed the field to join Kennedy, jumping fences to access the field and knocking over student band members. After the game, the District received calls from Satanists who "'intended to conduct ceremonies on the field after football games if others were allowed to.'" *Id.,* at 181. To secure the field and enable subsequent games to continue safely, the District was forced to make security arrangements with

---

[2] The Court describes the events of the October 16 game as having "spurred media coverage of Mr. Kennedy's case." *Ante,* at 5. In fact, the District Court found that Kennedy himself generated the media coverage by publicizing his dispute with the District in his initial Facebook posting and in his media appearances before the October 16 game. 443 F. Supp. 3d 1223, 1230 (WD Wash. 2020).

the local police and to post signs near the field and place robocalls to parents reiterating that the field was not open to the public.



Photograph of J. Kennedy in prayer circle (Oct. 16, 2015).

The District sent Kennedy another letter on October 23, explaining that his conduct at the October 16 game was inconsistent with the District's requirements for two reasons. First, it "drew [him] away from [his] work"; Kennedy had, "until recently, . . . regularly c[o]me to the locker room with the team and other coaches following the game" and had "specific responsibility for the supervision of players in the locker room following games." *Id.,* at 92–93. Second, his conduct raised Establishment Clause concerns, because "any reasonable observer saw a District employee, on the field only by virtue of his employment with the District, still on duty, under the bright lights of the stadium, engaged in what was clearly, given [his] prior public conduct, overtly religious conduct." *Id.,* at 93.

Again, the District emphasized that it was happy to accommodate Kennedy's desire to pray on the job in a way

that did not interfere with his duties or risk perceptions of endorsement. Stressing that "[d]evelopment of accommodations is an interactive process," it invited Kennedy to reach out to discuss accommodations that might be mutually satisfactory, offering proposed accommodations and inviting Kennedy to raise others. *Id.*, at 93–94. The District noted, however, that "further violations of [its] directives" would be grounds for discipline or termination. *Id.*, at 95.

Kennedy did not directly respond or suggest a satisfactory accommodation. Instead, his attorneys told the media that he would accept only demonstrative prayer on the 50-yard line immediately after games. During the October 23 and October 26 games, Kennedy again prayed at the 50-yard line immediately following the game, while postgame activities were still ongoing. At the October 23 game, Kennedy kneeled on the field alone with players standing nearby. At the October 26 game, Kennedy prayed surrounded by members of the public, including state representatives who attended the game to support Kennedy. The BHS players, after singing the fight song, joined Kennedy at midfield after he stood up from praying.



Photograph of J. Kennedy in prayer circle (Oct. 26, 2015).

In an October 28 letter, the District notified Kennedy that it was placing him on paid administrative leave for violating its directives at the October 16, October 23, and October 26 games by kneeling on the field and praying immediately following the games before rejoining the players for postgame talks. The District recounted that it had offered accommodations to, and offered to engage in further discussions with, Kennedy to permit his religious exercise, and that Kennedy had failed to respond to these offers. The District stressed that it remained willing to discuss possible accommodations if Kennedy was willing.

After the issues with Kennedy arose, several parents reached out to the District saying that their children had participated in Kennedy's prayers solely to avoid separating themselves from the rest of the team. No BHS students appeared to pray on the field after Kennedy's suspension.

In Kennedy's annual review, the head coach of the varsity team recommended Kennedy not be rehired because he "failed to follow district policy," "demonstrated a lack of cooperation with administration," "contributed to negative relations between parents, students, community members, coaches, and the school district," and "failed to supervise student-athletes after games due to his interactions with media and community" members. *Id.,* at 114. The head coach himself also resigned after 11 years in that position, expressing fears that he or his staff would be shot from the crowd or otherwise attacked because of the turmoil created by Kennedy's media appearances. Three of five other assistant coaches did not reapply.

C

Kennedy then filed suit. He contended, as relevant, that the District violated his rights under the Free Speech and Free Exercise Clauses of the First Amendment. Kennedy moved for a preliminary injunction, which the District

Court denied based on the circumstances surrounding Kennedy's prayers. The court concluded that Kennedy had "chose[n] a time and event," the October 16 homecoming game, that was "a big deal" for students, and then "used that opportunity to convey his religious views" in a manner a reasonable observer would have seen as a "public employee . . . leading an orchestrated session of faith." App. to Pet. for Cert. 303. The Court of Appeals affirmed, again emphasizing the specific context of Kennedy's prayers. The court rejected Kennedy's contention that he had been "praying on the fifty-yard line 'silently and alone.'" *Kennedy* v. *Bremerton School Dist.*, 869 F. 3d 813, 825 (CA9 2017). The court noted that he had in fact refused "an accommodation permitting him to pray . . . after the stadium had emptied," "indicat[ing] that it is essential that his speech be delivered in the presence of students and spectators." *Ibid.* This Court denied certiorari.

Following discovery, the District Court granted summary judgment to the District. The court concluded that Kennedy's 50-yard-line prayers were not entitled to protection under the Free Speech Clause because his speech was made in his capacity as a public employee, not as a private citizen. 443 F. Supp. 3d 1223, 1237 (WD Wash. 2020). In addition, the court held that Kennedy's prayer practice violated the Establishment Clause, reasoning that "speech from the center of the football field immediately after each game . . . conveys official sanction." *Id.,* at 1238. That was especially true where Kennedy, a school employee, initiated the prayer; Kennedy was "joined by students or adults to create a group of worshippers in a place the school controls access to"; and Kennedy had a long "history of engaging in religious activity with players" that would have led a familiar observer to believe that Kennedy was "continuing this tradition" with prayer at the 50-yard line. *Id.*, at 1238–1239. The District Court further found that players had reported

"feeling compelled to join Kennedy in prayer to stay connected with the team or ensure playing time," and that the "slow accumulation of players joining Kennedy suggests exactly the type of vulnerability to social pressure that makes the Establishment Clause vital in the high school context." *Id.*, at 1239. The court rejected Kennedy's free exercise claim, finding the District's directive narrowly tailored to its Establishment Clause concerns and citing Kennedy's refusal to cooperate in finding an accommodation that would be acceptable to him. *Id.,* at 1240.

The Court of Appeals affirmed, explaining that "the facts in the record utterly belie [Kennedy's] contention that the prayer was personal and private." 991 F. 3d 1004, 1017 (CA9 2021). The court instead concluded that Kennedy's speech constituted government speech, as he "repeatedly acknowledged that—and behaved as if—he was a mentor, motivational speaker, and role model to students specifically at the conclusion of the game." *Id.*, at 1015 (emphasis deleted). In the alternative, the court concluded that Kennedy's speech, even if in his capacity as a private citizen, was appropriately regulated by the District to avoid an Establishment Clause violation, emphasizing once more that this conclusion was tied to the specific "evolution of Kennedy's prayer practice with students" over time. *Id.,* at 1018. The court rejected Kennedy's free exercise claim for the reasons stated by the District Court. *Id.,* at 1020. The Court of Appeals denied rehearing en banc, and this Court granted certiorari.

## II

Properly understood, this case is not about the limits on an individual's ability to engage in private prayer at work. This case is about whether a school district is required to allow one of its employees to incorporate a public, communicative display of the employee's personal religious beliefs into a school event, where that display is recognizable as

part of a longstanding practice of the employee ministering religion to students as the public watched.  A school district is not required to permit such conduct; in fact, the Establishment Clause prohibits it from doing so.

### A

The Establishment Clause prohibits States from adopting laws "respecting an establishment of religion."  Amdt. 1; see *Wallace* v. *Jaffree*, 472 U. S. 38, 49 (1985) (recognizing the Clause's incorporation against the States).  The First Amendment's next Clause prohibits the government from making any law "prohibiting the free exercise thereof." Taken together, these two Clauses (the Religion Clauses) express the view, foundational to our constitutional system, "that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee* v. *Weisman*, 505 U. S. 577, 589 (1992).  Instead, "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere," which has the "freedom to pursue that mission." *Ibid.*

The Establishment Clause protects this freedom by "command[ing] a separation of church and state."  *Cutter* v. *Wilkinson*, 544 U. S. 709, 719 (2005).  At its core, this means forbidding "sponsorship, financial support, and active involvement of the sovereign in religious activity."  *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 668 (1970). In the context of public schools, it means that a State cannot use "its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals." *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203, 211 (1948).

Indeed, "[t]he Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."  *Edwards* v. *Aguillard*, 482 U. S. 578, 583–584 (1987).  The reasons motivating this

vigilance inhere in the nature of schools themselves and the young people they serve. Two are relevant here.

First, government neutrality toward religion is particularly important in the public school context given the role public schools play in our society. "'The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny,'" meaning that "'[i]n no activity of the State is it more vital to keep out divisive forces than in its schools.'" *Id.* at 584. Families "entrust public schools with the education of their children . . . on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Ibid.* Accordingly, the Establishment Clause "proscribes public schools from 'conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred'" or otherwise endorsing religious beliefs. *Lee*, 505 U. S., at 604–605 (Blackmun, J., concurring) (emphasis deleted).

Second, schools face a higher risk of unconstitutionally "coerc[ing] . . . support or participat[ion] in religion or its exercise" than other government entities. *Id.,* at 587 (opinion of the Court). The State "exerts great authority and coercive power" in schools as a general matter "through mandatory attendance requirements." *Edwards*, 482 U. S., at 584. Moreover, the State exercises that great authority over children, who are uniquely susceptible to "subtle coercive pressure." *Lee*, 505 U. S., at 588; cf. *Town of Greece* v. *Galloway*, 572 U. S. 565, 590 (2014) (plurality opinion) ("[M]ature adults," unlike children, may not be "'readily susceptible to religious indoctrination or peer pressure'"). Children are particularly vulnerable to coercion because of their "emulation of teachers as role models" and "susceptibility to peer pressure." *Edwards*, 482 U. S., at 584. Accordingly, this Court has emphasized that "the State may

not, consistent with the Establishment Clause, place primary and secondary school children" in the dilemma of choosing between "participating, with all that implies, or protesting" a religious exercise in a public school. *Lee*, 505 U. S., at 593.

Given the twin Establishment Clause concerns of endorsement and coercion, it is unsurprising that the Court has consistently held integrating prayer into public school activities to be unconstitutional, including when student participation is not a formal requirement or prayer is silent. See *Wallace*, 472 U. S. 38 (mandatory moment of silence for prayer); *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963) (nonmandatory recitation of Bible verses and prayer); *Engel*, 370 U. S., at 424 (nonmandatory recitation of one-sentence prayer). The Court also has held that incorporating a nondenominational general benediction into a graduation ceremony is unconstitutional. *Lee*, 505 U. S. 577. Finally, this Court has held that including prayers in student football games is unconstitutional, even when delivered by students rather than staff and even when students themselves initiated the prayer. *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290 (2000).

## B

Under these precedents, the Establishment Clause violation at hand is clear. This Court has held that a "[s]tate officia[l] direct[ing] the performance of a formal religious exercise" as a part of the "ceremon[y]" of a school event "conflicts with settled rules pertaining to prayer exercises for students." *Lee*, 505 U. S., at 586–587. Kennedy was on the job as a school official "on government property" when he incorporated a public, demonstrative prayer into "government-sponsored school-related events" as a regularly scheduled feature of those events. *Santa Fe*, 530 U. S., at 302.

Kennedy's tradition of a 50-yard line prayer thus strikes at the heart of the Establishment Clause's concerns about

endorsement. For students and community members at the game, Coach Kennedy was the face and the voice of the District during football games. The timing and location Kennedy selected for his prayers were "clothed in the traditional indicia of school sporting events." *Id.,* at 308. Kennedy spoke from the playing field, which was accessible only to students and school employees, not to the general public. Although the football game itself had ended, the football game events had not; Kennedy himself acknowledged that his responsibilities continued until the players went home. Kennedy's postgame responsibilities were what placed Kennedy on the 50-yard line in the first place; that was, after all, where he met the opposing team to shake hands after the game. Permitting a school coach to lead students and others he invited onto the field in prayer at a predictable time after each game could only be viewed as a postgame tradition occurring "with the approval of the school administration." *Ibid.*

Kennedy's prayer practice also implicated the coercion concerns at the center of this Court's Establishment Clause jurisprudence. This Court has previously recognized a heightened potential for coercion where school officials are involved, as their "effort[s] to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject." *Lee*, 505 U. S., at 590. The reasons for fearing this pressure are self-evident. This Court has recognized that students face immense social pressure. Students look up to their teachers and coaches as role models and seek their approval. Students also depend on this approval for tangible benefits. Players recognize that gaining the coach's approval may pay dividends small and large, from extra playing time to a stronger letter of recommendation to additional support in college athletic recruiting. In addition to these pressures to please their coaches, this Court has recognized that players face "immense social pressure" from their peers in the "extracurricular event

that is American high school football." *Santa Fe*, 530 U. S., at 311.

The record before the Court bears this out. The District Court found, in the evidentiary record, that some students reported joining Kennedy's prayer because they felt social pressure to follow their coach and teammates. Kennedy told the District that he began his prayers alone and that players followed each other over time until a majority of the team joined him, an evolution showing coercive pressure at work.

Kennedy does not defend his longstanding practice of leading the team in prayer out loud on the field as they kneeled around him. Instead, he responds, and the Court accepts, that his highly visible and demonstrative prayer at the last three games before his suspension did not violate the Establishment Clause because these prayers were quiet and thus private. This Court's precedents, however, do not permit isolating government actions from their context in determining whether they violate the Establishment Clause. To the contrary, this Court has repeatedly stated that Establishment Clause inquiries are fact specific and require careful consideration of the origins and practical reality of the specific practice at issue. See, *e.g.*, *id.,* at 315; *Lee*, 505 U. S., at 597. In *Santa Fe*, the Court specifically addressed how to determine whether the implementation of a new policy regarding prayers at football games "insulates the continuation of such prayers from constitutional scrutiny." 530 U. S., at 315. The Court held that "inquiry into this question not only can, but must, include an examination of the circumstances surrounding" the change in policy, the "long-established tradition" before the change, and the "'unique circumstances'" of the school in question. *Ibid.* This Court's precedent thus does not permit treating Kennedy's "new" prayer practice as occurring on a blank slate, any more than those in the District's school community would have experienced Kennedy's changed practice (to the

degree there was one) as erasing years of prior actions by Kennedy.

Like the policy change in *Santa Fe,* Kennedy's "changed" prayers at these last three games were a clear continuation of a "long-established tradition of sanctioning" school official involvement in student prayers. *Ibid.* Students at the three games following Kennedy's changed practice witnessed Kennedy kneeling at the same time and place where he had led them in prayer for years. They witnessed their peers from opposing teams joining Kennedy, just as they had when Kennedy was leading joint team prayers. They witnessed members of the public and state representatives going onto the field to support Kennedy's cause and pray with him. Kennedy did nothing to stop this unauthorized access to the field, a clear dereliction of his duties. The BHS players in fact joined the crowd around Kennedy after he stood up from praying at the last game. That BHS students did not join Kennedy in these last three specific prayers did not make those events compliant with the Establishment Clause. The coercion to do so was evident. Kennedy himself apparently anticipated that his continued prayer practice would draw student participation, requesting that the District agree that it would not "interfere" with students joining him in the future. App. 71.

Finally, Kennedy stresses that he never formally required students to join him in his prayers. But existing precedents do not require coercion to be explicit, particularly when children are involved. To the contrary, this Court's Establishment Clause jurisprudence establishes that "'the government may no more use social pressure to enforce orthodoxy than it may use more direct means.'" *Santa Fe*, 530 U. S., at 312. Thus, the Court has held that the Establishment Clause "will not permit" a school "'to exact religious conformity from a student as the price' of joining her classmates at a varsity football game." *Ibid.* To uphold a coach's integration of prayer into the ceremony of

a football game, in the context of an established history of the coach inviting student involvement in prayer, is to exact precisely this price from students.

C

As the Court explains, see *ante,* at 15, Kennedy did not "shed [his] constitutional rights . . . at the schoolhouse gate" while on duty as a coach. *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969). Constitutional rights, however, are not absolutes. Rights often conflict and balancing of interests is often required to protect the separate rights at issue. See *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. ___, ___ (2022) (slip op., at 12) (BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (noting that "the presence of countervailing interests . . . is what ma[kes]" a constitutional question "hard, and what require[s] balancing").

The particular tensions at issue in this case, between the speech interests of the government and its employees and between public institutions' religious neutrality and private individuals' religious exercise, are far from novel. This Court's settled precedents offer guidance to assist courts, governments, and the public in navigating these tensions. Under these precedents, the District's interest in avoiding an Establishment Clause violation justified both its time and place restrictions on Kennedy's speech and his exercise of religion.

First, as to Kennedy's free speech claim, Kennedy "accept[ed] certain limitations" on his freedom of speech when he accepted government employment. *Garcetti* v. *Ceballos*, 547 U. S. 410, 418 (2006). The Court has recognized that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions" to ensure "the efficient provision of public services." *Ibid.* Case law instructs balancing "the interests of the teacher, as a citizen, in commenting upon matters of

public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" to determine whose interests should prevail. *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968).

As the Court of Appeals below outlined, the District has a strong argument that Kennedy's speech, formally integrated into the center of a District event, was speech in his official capacity as an employee that is not entitled to First Amendment protections at all. See *Garcetti*, 547 U. S., at 418; 991 F. 3d, at 1014–1016 (applying *Garcetti*).[3] It is unnecessary to resolve this question, however, because, even assuming that Kennedy's speech was in his capacity as a private citizen, the District's responsibilities under the Establishment Clause provided "adequate justification" for restricting it. *Garcetti*, 547 U. S., at 418.

Similarly, Kennedy's free exercise claim must be considered in light of the fact that he is a school official and, as such, his participation in religious exercise can create Establishment Clause conflicts. Accordingly, his right to pray at any time and in any manner he wishes while exercising his professional duties is not absolute. See *Lee*, 505 U. S.,

––––––––––

[3] The Court's primary argument that Kennedy's speech is not in his official capacity is that he was permitted "to call home, check a text, [or] socialize" during the time period in question. *Ante,* at 18–19. These truly private, informal communications bear little resemblance, however, to what Kennedy did. Kennedy explicitly sought to make his demonstrative prayer a permanent ritual of the postgame events, at the physical center of those events, where he was present by virtue of his job responsibilities, and after years of giving prayer-filled motivational speeches to students at the same relative time and location. In addition, Kennedy gathered public officials and other members of the public onto the field to join him in the prayer, contrary to school policies controlling access to the field. Such behavior raises an entirely different risk of depriving the employer of "control over what the employer itself has commissioned or created" than an employee making a call home on the sidelines, fleetingly checking email, or pausing to hug a friend in the crowd. *Garcetti*, 547 U. S., at 422.

at 587 (noting that a school official's choice to integrate a prayer is "attributable to the State"). As the Court explains, see *ante,* at 13–14, the parties agree (and I therefore assume) that for the purposes of Kennedy's claim, the burden is on the District to establish that its policy prohibiting Kennedy's public prayers was the least restrictive means of furthering a compelling state interest. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993).

Here, the District's directive prohibiting Kennedy's demonstrative speech at the 50-yard line was narrowly tailored to avoid an Establishment Clause violation. The District's suspension of Kennedy followed a long history. The last three games proved that Kennedy did not intend to pray silently, but to thrust the District into incorporating a religious ceremony into its events, as he invited others to join his prayer and anticipated in his communications with the District that students would want to join as well. Notably, the District repeatedly sought to work with Kennedy to develop an accommodation to permit him to engage in religious exercise during or after his game-related responsibilities. Kennedy, however, ultimately refused to respond to the District's suggestions and declined to communicate with the District, except through media appearances. Because the District's valid Establishment Clause concerns satisfy strict scrutiny, Kennedy's free exercise claim fails as well.

### III

Despite the overwhelming precedents establishing that school officials leading prayer violates the Establishment Clause, the Court today holds that Kennedy's midfield prayer practice did not violate the Establishment Clause. This decision rests on an erroneous understanding of the Religion Clauses. It also disregards the balance this Court's cases strike among the rights conferred by the Clauses. The Court relies on an assortment of pluralities,

concurrences, and dissents by Members of the current majority to effect fundamental changes in this Court's Religion Clauses jurisprudence, all the while proclaiming that nothing has changed at all.

A

This case involves three Clauses of the First Amendment. As a threshold matter, the Court today proceeds from two mistaken understandings of the way the protections these Clauses embody interact.

First, the Court describes the Free Exercise and Free Speech Clauses as "work[ing] in tandem" to "provid[e] overlapping protection for expressive religious activities," leaving religious speech "doubly protect[ed]." *Ante,* at 11. This narrative noticeably (and improperly) sets the Establishment Clause to the side. The Court is correct that certain expressive religious activities may fall within the ambit of both the Free Speech Clause and the Free Exercise Clause, but "the First Amendment protects speech and religion by quite different mechanisms." *Lee,* 505 U. S., at 591. The First Amendment protects speech "by ensuring its full expression even when the government participates." *Ibid.* Its "method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse," however, based on the understanding that "the government is not a prime participant" in "religious debate or expression," whereas government is the "object of some of our most important speech." *Ibid.* Thus, as this Court has explained, while the Free Speech Clause has "close parallels in the speech provisions of the First Amendment," the First Amendment's protections for religion diverge from those for speech because of the Establishment Clause, which provides a "specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions." *Ibid.* Therefore, while our Constitution "coun-

sel[s] mutual respect and tolerance," the Constitution's vision of how to achieve this end does in fact involve some "singl[ing] out" of religious speech by the government. *Ante*, at 1. This is consistent with "the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce." *Lee*, 505 U. S., at 591–592.

Second, the Court contends that the lower courts erred by introducing a false tension between the Free Exercise and Establishment Clauses. See *ante,* at 20–21. The Court, however, has long recognized that these two Clauses, while "express[ing] complementary values," "often exert conflicting pressures." *Cutter*, 544 U. S., at 719. See also *Locke* v. *Davey*, 540 U. S. 712, 718 (2004) (describing the Clauses as "frequently in tension"). The "absolute terms" of the two Clauses mean that they "tend to clash" if "expanded to a logical extreme." *Walz*, 397 U. S., at 668–669.

The Court inaccurately implies that the courts below relied upon a rule that the Establishment Clause must always "prevail" over the Free Exercise Clause. *Ante,* at 20. In focusing almost exclusively on Kennedy's free exercise claim, however, and declining to recognize the conflicting rights at issue, the Court substitutes one supposed blanket rule for another. The proper response where tension arises between the two Clauses is not to ignore it, which effectively silently elevates one party's right above others. The proper response is to identify the tension and balance the interests based on a careful analysis of "whether [the] particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz*, 397 U. S., at 669. As discussed above, that inquiry leads to the conclusion that permitting Kennedy's desired religious practice at the time and place of his choosing, without regard to the legitimate needs of his employer, violates the Establishment Clause in the particular context

at issue here. *Supra,* at 16–20.

B

For decades, the Court has recognized that, in determining whether a school has violated the Establishment Clause, "one of the relevant questions is whether an objective observer, acquainted with the text, legislative history, and implementation of the [practice], would perceive it as a state endorsement of prayer in public schools." *Santa Fe*, 530 U. S., at 308 (internal quotation marks omitted). The Court now says for the first time that endorsement simply does not matter, and completely repudiates the test established in *Lemon*, 403 U. S. 602. *Ante,* at 22–24. Both of these moves are erroneous and, despite the Court's assurances, novel.

Start with endorsement. The Court reserves particular criticism for the longstanding understanding that government action that appears to endorse religion violates the Establishment Clause, which it describes as an "offshoot" of *Lemon* and paints as a "'modified heckler's veto, in which . . . religious activity can be proscribed'" based on "'"perceptions"'" or "'"discomfort."'" *Ante,* at 21–22 (quoting *Good News Club* v. *Milford Central School*, 533 U. S. 98, 119 (2001)). This is a strawman. Precedent long has recognized that endorsement concerns under the Establishment Clause, properly understood, bear no relation to a "'heckler's veto.'" *Ante*, as 22. *Good News Club* itself explained the difference between the two: The endorsement inquiry considers the perspective not of just any hypothetical or uninformed observer experiencing subjective discomfort, but of "'the reasonable observer'" who is "'aware of the history and context of the community and forum in which the religious [speech takes place].'" 533 U. S., at 119. That is because "'the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from . . . discomfort'" but concern "'with the

political community writ large.'" *Ibid.* (emphasis deleted).

Given this concern for the political community, it is unsurprising that the Court has long prioritized endorsement concerns in the context of public education. See, *e.g., Santa Fe*, 530 U. S., at 305; *Wallace*, 472 U. S., at 60–61; *Edwards*, 482 U. S., at 578, 593; see also *Lee*, 505 U. S., at 618–619 (Souter, J., concurring) (explaining that many of the Court's Establishment Clause holdings in the school context are concerned not with whether the policy in question "coerced students to participate in prayer" but with whether it "'convey[ed] a message of state approval of prayer activities in the public schools'" (quoting *Wallace*, 472 U. S., at 61)).[4]  No subsequent decisions in other contexts, including the cases about monuments and legislative meetings on which the Court relies, have so much as questioned the application of this core Establishment Clause concern in the context of public schools.  In fact, *Town of Greece* v. *Galloway*, 572 U. S. 565, which held a prayer during a town meeting permissible, specifically distinguished *Lee* because *Lee* considered the Establishment Clause in the context of schools.  572 U. S., at 590 (plurality opinion).

Paying heed to these precedents would not "'purge from the public sphere' anything an observer could reasonably infer endorses" religion.  *Ante,* at 22.  To the contrary, the Court has recognized that "there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students."  *Lee,* 505 U. S., at 598–599.  These instances, the Court has said, are "often questions of accommodat[ing]" religious practices to the degree possible while respecting the

---

[4] The Court attempts to recast *Lee* and *Santa Fe* as solely concerning coercion, *ante,* at 29–30, but both cases emphasized that it was important to avoid appearances of "'state endorsement of prayer in public schools.'" *Santa Fe*, 530 U. S., at 308; see *Lee*, 505 U. S., at 590 (finding that the "degree of school involvement" indicated that the "prayers bore the imprint of the State").

Establishment Clause. *Id.*, at 599.[5]  In short, the endorsement inquiry dictated by precedent is a measured, practical, and administrable one, designed to account for the competing interests present within any given community.

Despite all of this authority, the Court claims that it "long ago abandoned" both the "endorsement test" and this Court's decision in *Lemon* 403 U. S. 602. *Ante,* at 22.  The Court chiefly cites the plurality opinion in *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_ (2019) to support this contention.  That plurality opinion, to be sure, criticized *Lemon*'s effort at establishing a "grand unified theory of the Establishment Clause" as poorly suited to the broad "array" of diverse establishment claims.  588 U. S*.,* at \_\_\_, \_\_\_ (slip op., at 13, 24).  All the Court in *American Legion* ultimately held, however, was that application of the *Lemon* test to "longstanding monuments, symbols, and practices" was ill-advised for reasons specific to those contexts.  588 U. S*.,* at \_\_\_ (slip op., at 16); see also *id.,* at \_\_\_–\_\_\_ (slip op., at 16–21) (discussing at some length why the *Lemon* test was a poor fit for those circumstances).  The only categorical rejection of *Lemon* in *American Legion* appeared in separate writings.  See 588 U. S*.,* at \_\_\_ (slip op., at 1) (KAVANAUGH, J., concurring); *id.,* at \_\_\_ (slip op., at 6)

―――――――

[5] The notion that integration of religious practices into the workplace may require compromise and accommodation is not unique to the public-employer context where Establishment Clause concerns arise.  The Court's precedents on religious discrimination claims similarly recognize that the employment context requires balancing employer and employee interests, and that religious practice need not always be accommodated.  See *Kennedy* v. *Bremerton School Dist.*, 586 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 6) (ALITO, J., statement respecting denial of certiorari) (noting that "Title VII's prohibition of discrimination on the basis of religion does not require an employer to make any accommodation that imposes more than a *de minimis* burden").  Surely, an employee's religious practice that forces a school district to engage in burdensome measures to stop spectators from rushing onto a field and knocking people down imposes much more than a *de minimis* burden.

(THOMAS, J., concurring in judgment); *id.,* at ___ (slip op., at 7) (GORSUCH, J., concurring in judgment); see *ante,* at 23, n. 4.[6]

The Court now goes much further, overruling *Lemon* entirely and in all contexts. It is wrong to do so. *Lemon* summarized "the cumulative criteria developed by the Court over many years" of experience "draw[ing] lines" as to when government engagement with religion violated the Establishment Clause. 403 U. S., at 612. *Lemon* properly concluded that precedent generally directed consideration of whether the government action had a "secular legislative purpose," whether its "principal or primary effect must be one that neither advances nor inhibits religion," and whether in practice it "foster[s] 'an excessive government entanglement with religion.'" *Id.,* at 612–613. It is true "that rigid application of the *Lemon* test does not solve every Establishment Clause problem," but that does not mean that the test has no value. *American Legion*, 588 U. S., at ___ (slip op., at 1) (KAGAN, J., concurring in part).

To put it plainly, the purposes and effects of a government action matter in evaluating whether that action violates the Establishment Clause, as numerous precedents beyond *Lemon* instruct in the particular context of public schools. See *supra,* at 14–16, 18. Neither the critiques of *Lemon* as setting out a dispositive test for all seasons nor

––––––––––––

   [6] The Court also cites *Shurtleff* v. *Boston*, 596 U. S. ___ (2022), as evidence that the *Lemon* test has been rejected. See *ante,* at 23. Again, while separate writings in *Shurtleff* criticized *Lemon*, the Court did not. The opinion of the Court simply applied the longstanding rule that, when the government does not speak for itself, it cannot exclude speech based on the speech's "'religious viewpoint.'" *Shurtleff*, 596 U. S., at ___ (slip op., at 12) (quoting *Good News Club*, 533 U. S., at 112). The Court further infers *Lemon*'s implicit overruling from recent decisions that do not apply its test. See *ante,* at 23, n. 4. As explained above, however, not applying a test in a given case is a different matter from overruling it entirely and, moreover, the Court has never before questioned the relevance of endorsement in the school-prayer context.

the fact that the Court has not referred to *Lemon* in all sit-uations support this Court's decision to dismiss that prece-dent entirely, particularly in the school context.

C

Upon overruling one "grand unified theory," the Court in-troduces another: It holds that courts must interpret whether an Establishment Clause violation has occurred mainly "by 'reference to historical practices and under-standings.'" *Ante,* at 23 (quoting *Town of Greece*, 572 U. S., at 576 (internal quotation marks omitted)). Here again, the Court professes that nothing has changed. In fact, while the Court has long referred to historical practice as one el-ement of the analysis in specific Establishment Clause cases, the Court has never announced this as a general test or exclusive focus. *American Legion,* 588 U. S*.,* at \_\_\_–\_\_\_ (BREYER, J., concurring) (slip op., at 2–3) (noting that the Court was "appropriately 'look[ing] to history for guidance'" but was not "adopt[ing] a 'history and tradition test'").

The Court reserves any meaningful explanation of its his-tory-and-tradition test for another day, content for now to disguise it as established law and move on. It should not escape notice, however, that the effects of the majority's new rule could be profound. The problems with elevating history and tradition over purpose and precedent are well documented. See *Dobbs*, 597 U. S., at \_\_\_ (BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (slip op., at 16) (explaining that the Framers "defined rights in general terms to permit future evolution in their scope and mean-ing"); *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (BREYER, J., dissenting) (slip op., at 24–28) (explaining the pitfalls of a "near-exclusive reli-ance on history" and offering examples of when this Court has "misread" history in the past); *Brown* v. *Davenport*, 596 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (KAGAN, J., dissenting) (slip op., at

7–8) (noting the inaccuracies risked when courts "play amateur historian").

For now, it suffices to say that the Court's history-and-tradition test offers essentially no guidance for school administrators. If even judges and Justices, with full adversarial briefing and argument tailored to precise legal issues, regularly disagree (and err) in their amateur efforts at history, how are school administrators, faculty, and staff supposed to adapt? How will school administrators exercise their responsibilities to manage school curriculum and events when the Court appears to elevate individuals' rights to religious exercise above all else? Today's opinion provides little in the way of answers; the Court simply sets the stage for future legal changes that will inevitably follow the Court's choice today to upset longstanding rules.

D

Finally, the Court acknowledges that the Establishment Clause prohibits the government from coercing people to engage in religion practice, *ante*, at 24–25, but its analysis of coercion misconstrues both the record and this Court's precedents.

The Court claims that the District "never raised coercion concerns" simply because the District conceded that there was "'no evidence that students [were] *directly* coerced to pray with Kennedy.'" *Ante,* at 25 (emphasis added). The Court's suggestion that coercion must be "direc[t]" to be cognizable under the Establishment Clause is contrary to long-established precedent. The Court repeatedly has recognized that indirect coercion may raise serious establishment concerns, and that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U. S., at 592 (opinion of the Court); see also *supra,* at 15–16. Tellingly, *none* of this Court's major cases involving school prayer concerned school practices that required

students to do any more than listen silently to prayers, and some did not even formally require students to listen, instead providing that attendance was not mandatory. See *Santa Fe*, 530 U. S., at 296–298; *Lee*, 505 U. S., at 593; *Wallace*, 472 U. S., at 40; *School Dist. of Abington Township*, 374 U. S., at 205; *Engel*, 370 U. S., at 422. Nevertheless, the Court concluded that the practices were coercive as a constitutional matter.

Today's Court quotes the *Lee* Court's remark that enduring others' speech is "'part of learning how to live in a pluralistic society.'" *Ante,* at 26 (quoting *Lee*, 505 U. S., at 590). The *Lee* Court, however, expressly concluded, in the very same paragraph, that "[t]his argument cannot prevail" in the school-prayer context because the notion that being subject to a "brief" prayer in school is acceptable "overlooks a fundamental dynamic of the Constitution": its "specific prohibition on . . . state intervention in religious affairs." *Id.*, at 591; see also *id.,* at 594 ("[T]he government may no more use social pressure to enforce orthodoxy than it may use more direct means").[7]

The Court also distinguishes *Santa Fe* because Kennedy's prayers "were not publicly broadcast or recited to a captive audience." *Ante,* at 30. This misses the point. In *Santa Fe*, a student council chaplain delivered a prayer over the public-address system before each varsity football game of the season. 530 U. S., at 294. Students were not required as a general matter to attend the games, but "cheerleaders, members of the band, and, of course, the team members

---

[7] The Court further claims that *Lee* is distinguishable because it involved prayer at an event in which the school had "'in every practical sense compelled attendance and participation in [a] religious exercise.'" *Ante*, at 29 (quoting *Lee*, 505 U. S., at 598). The Court in *Lee*, however, recognized expressly that attendance at the graduation ceremony was not mandatory and that students who attended only had to remain silent during and after the prayers. *Id.*, at 583, 593.

themselves" were, and the Court would have found an "improper effect of coercing those present" even if it "regard[ed] every high school student's decision to attend . . . as purely voluntary." *Id.,* at 311–312. Kennedy's prayers raise precisely the same concerns. His prayers did not need to be broadcast. His actions spoke louder than his words. His prayers were intentionally, visually demonstrative to an audience aware of their history and no less captive than the audience in *Santa Fe,* with spectators watching and some players perhaps engaged in a song, but all waiting to rejoin their coach for a postgame talk. Moreover, Kennedy's prayers had a greater coercive potential because they were delivered not by a student, but by their coach, who was still on active duty for postgame events.

In addition, despite the direct record evidence that students felt coerced to participate in Kennedy's prayers, the Court nonetheless concludes that coercion was not present in any event because "Kennedy did not seek to direct any prayers to students or require anyone else to participate." *Ante,* at 26; see also *ante,* at 30, n. 7 (contending that the fact that "students might choose, unprompted, to participate" in their coach's on-the-field prayers does not "necessarily prove them coercive"). But nowhere does the Court engage with the unique coercive power of a coach's actions on his adolescent players.[8]

In any event, the Court makes this assertion only by drawing a bright line between Kennedy's yearslong practice of leading student prayers, which the Court does not de-

_____

[8] Puzzlingly, the Court goes a step further and suggests that Kennedy may have been in violation of the District policy on Religious-Related Activities and Practices if he did not permit the players to join his prayers because the policy prohibited staff from "discourag[ing]" student prayer. *Ante,* at 4, 30, n. 7. The policy, however, specifically referred to student prayer of the student's "own volition" and equally prohibited staff from "encourag[ing]" student prayer. App. 28.

fend, and Kennedy's final three prayers, which BHS students did not join, but student peers from the other teams did. See *ante*, at 26 (distinguishing Kennedy's prior practice and focusing narrowly on "three prayers . . . in October 2015"). As discussed above, see *supra,* at 18, this mode of analysis contravenes precedent by "turn[ing] a blind eye to the context in which [Kennedy's practice] arose," *Santa Fe*, 530 U. S., at 315.[9] This Court's precedents require a more nuanced inquiry into the realities of coercion in the specific school context concerned than the majority recognizes today. The question before the Court is not whether a coach taking a knee to pray on the field would constitute an Establishment Clause violation in any and all circumstances. It is whether permitting Kennedy to continue a demonstrative prayer practice at the center of the football field after years of inappropriately leading students in prayer in the same spot, at that same time, and in the same manner, which led students to feel compelled to join him, violates the Establishment Clause. It does.

Having disregarded this context, the Court finds Kennedy's three-game practice distinguishable from precedent

_____

[9] The Court claims that Kennedy's "past prayer practices" should not be seen to "taint" his current ones by again turning to *Town of Greece* v. *Galloway*, the town assembly prayer case. *Ante,* at 30, n. 7. In the passage the Court cites, *Town of Greece* concluded that "two remarks" by two different "guest minister[s]" on two isolated occasions did not constitute a "pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose." 572 U. S., at 585. As *Town of Greece* itself emphasizes, the school context presents Establishment Clause concerns distinct from those raised in a town meeting for "mature adults." *Id.,* at 590 (plurality opinion). See *supra,* at 15. In any event, Kennedy's yearslong "past prayer practices" constituted an established pattern, not an isolated occasion, and he hardly "abandoned" the practice. *Ante,* at 30, n. 7. As his October 14 letter and subsequent actions made clear, Kennedy attempted to hew as closely to his past practice as possible, taking a knee at the same time and place as previously, and in the same manner that initially drew students to join him and by improperly permitting spectators to join him on the field.

because the prayers were "quie[t]" and the students were otherwise "occupied." *Ante,* at 26. The record contradicts this narrative. Even on the Court's myopic framing of the facts, at two of the three games on which the Court focuses, players witnessed student peers from the other team and other authority figures surrounding Kennedy and joining him in prayer. The coercive pressures inherent in such a situation are obvious. Moreover, Kennedy's actual demand to the District was that he give "verbal" prayers specifically at the midfield position where he traditionally led team prayers, and that students be allowed to join him "voluntarily" and pray. App. 64, 69–71. Notably, the Court today does not embrace this demand, but it nonetheless rejects the District's right to ensure that students were not pressured to pray.

To reiterate, the District did not argue, and neither court below held, that "*any* visible religious conduct by a teacher or coach should be deemed . . . impermissibly coercive on students." *Ante,* at 28. Nor has anyone contended that a coach may never visibly pray on the field. The courts below simply recognized that Kennedy continued to initiate prayers visible to students, while still on duty during school events, under the exact same circumstances as his past practice of leading student prayer. It is unprecedented for the Court to hold that this conduct, taken as a whole, did not raise cognizable coercion concerns. Importantly, nothing in the Court's opinion should be read as calling into question that Kennedy's conduct may have raised other concerns regarding disruption of school events or misuse of school facilities that would have separately justified employment action against Kennedy.

\*          \*          \*

The Free Exercise Clause and Establishment Clause are equally integral in protecting religious freedom in our society. The first serves as "a promise from our government,"

while the second erects a "backstop that disables our government from breaking it" and "start[ing] us down the path to the past, when [the right to free exercise] was routinely abridged." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_, \_\_\_ (2017) (SOTOMAYOR, J., dissenting) (slip op., at 26).

Today, the Court once again weakens the backstop. It elevates one individual's interest in personal religious exercise, in the exact time and place of that individual's choosing, over society's interest in protecting the separation between church and state, eroding the protections for religious liberty for all. Today's decision is particularly misguided because it elevates the religious rights of a school official, who voluntarily accepted public employment and the limits that public employment entails, over those of his students, who are required to attend school and who this Court has long recognized are particularly vulnerable and deserving of protection. In doing so, the Court sets us further down a perilous path in forcing States to entangle themselves with religion, with all of our rights hanging in the balance. As much as the Court protests otherwise, today's decision is no victory for religious liberty. I respectfully dissent.